**MULTIMEDIA PUBLISHING COMPANY OF SOUTH CAROLINA, INC., and The New York Times Company, Plaintiffs,**

v.

**GREENVILLE–SPARTANBURG AIRPORT DISTRICT, and Gary Jackson, in his official capacity as Executive Director of the Greenville–Spartanburg Airport Commission, Defendants.**

**Civ. A. No. 6:90–2591–3.**

United States District Court, D. South Carolina, Greenville Division.

May 7, 1991.

---

Wallace K. Lightsey, Wyche, Burgess, Freeman & Parham, P.A., Greenville, S.C., for plaintiffs.

Stanley T. Case, Edward G. Smith, Butler, Means, Evins & Browne, Spartanburg, S.C., for defendants.

## ORDER AND INJUNCTION

GEORGE ROSS ANDERSON, Jr., District Judge.

In this action the plaintiffs allege that the defendants' refusal to allow plaintiffs to place newsracks in the terminal of the Greenville–Spartanburg Airport violates the plaintiffs' rights of free speech and press under the United States and South Carolina Constitutions. The plaintiffs seek an injunction ordering the defendants to allow newsracks in the terminal.

The Court held a nonjury trial of this action on April 29, 1991. After consideration of the testimony and exhibits, and for the reasons hereinafter set forth in the Findings of Fact and Conclusions of Law, the Court finds for the plaintiffs. The Court therefore grants the injunction sought by plaintiffs, on the terms set forth hereinbelow.

## FINDINGS OF FACT

1. Plaintiff Multimedia Publishing Company of South Carolina, Inc., is a South Carolina corporation with its principal place of business in Greenville, South Carolina, and its principal business activity the publication and sale of *The Greenville News* and *The Greenville Piedmont,* both of which are daily newspapers of general circulation in the piedmont area of South Carolina.

2. Plaintiff The New York Times Company is a New York corporation with its principal place of business in New York and one of its business activities the publication and sale of *The Spartanburg Herald–Journal,* a daily newspaper of general circulation in the piedmont area of South Carolina.

3. Defendant Greenville–Spartanburg Airport District is a body politic and corporate created by a South Carolina statute, S.C.Code Ann. § 55–11–110 (Law. Co-op. 1976), to carry out, through the Greenville–Spartanburg Airport Commission, the operation of the Greenville–Spartanburg Airport (hereinafter the "Airport").

4. Defendant Gary Jackson is the Executive Director of the Greenville–Spartanburg Airport Commission.

5. The Airport is a public airport. Public access to the Airport is primarily through an access road from nearby Interstate Highway 85. Access to the terminal is unrestricted, although in recent months, because of the Persian Gulf hostilities, the Airport has restricted access to the concourses to passengers with tickets or persons with security clearance.

6. The Airport recently underwent a major renovation, which more than doubled its size. The renovation was designed to accommodate anticipated traffic at the Airport through the end of this century.

7. As one approaches the entrance to the Airport, to the right are several uncovered parking lots available for use by the public. To the left and front of the terminal is a multi-level parking garage, which is also available to the public.

8. The basic configuration of the Airport terminal is as follows: Ticket and baggage claim areas are in a lower lobby at the street level in the front of the terminal. The lower lobby is spacious and uncrowded. It includes, in addition to the ticket and baggage claim areas, a large fountain, a bank, a travel agent office, rental car agency bureaus, public telephones, seating areas, planters and trash containers. Two banks of escalators ascend from these areas to a middle level containing, among other things, public restrooms, a gift shop, a bar, a restaurant, public telephone booths, vending machines, planters, trash containers, and an outdoor terrace from which people may watch the airplanes. From this middle level two separate passages lead in opposite directions to two separate security checkpoints. After passing through the appropriate security checkpoint, passengers ascend via an escalator to one of the two concourses of the terminal. The concourses are spacious; they contain the individual gates used to board airplanes, the respective airline desk for each gate, seating areas, public restrooms, desks with individual telephones and work areas for awaiting or arriving passengers, planters, trash containers, and large open areas.

9. The Airport gift shop sells the plaintiffs' newspapers, among others. The hours of the gift shop presently are 6:30 a.m. to 9:00 p.m. At present, approximately a dozen flights are scheduled to depart before 6:30 a.m. and to arrive at or after 9:00 p.m.[1]

10. There are no newsracks (or any other form of newspaper-dispensing devices) in the Airport terminal. Other than through the gift shop, newspapers are not available anywhere in the Airport terminal. Since the summer of 1990, the Airport Commission has allowed newsracks in the parking garage, and the plaintiffs have set up racks for their papers there. In addi-

---

1. The Court also takes judicial notice of the fact that flights often arrive after the scheduled arrival time.

tion to *The Greenville News*, *The Greenville Piedmont*, and *The Spartanburg Herald–Journal*, three other newspapers have set up racks in the parking garage.

11. The public passageways in the terminal are such that, if a passenger is arriving or departing through Concourse A, he can enter or leave through the baggage claim area without walking past the gift shop.

12. In the fall of 1988, Steve Brandt, who is the General Manager of The Greenville News–Piedmont Company, approached Dick Graham, then Executive Director of the Airport Commission, about placing newsracks in the Airport terminal. The concerns which prompted Mr. Brandt to make this approach were that newspaper availability in the terminal was limited to the gift shop during its hours of operation. The newspaper had received complaints from various businesspeople in Greenville about not being able to get a paper when leaving early or arriving late at the Airport.

13. Mr. Brandt, Mr. Graham, and a member of the newspaper's Marketing Committing, Deborah Davis, met on November 2, 1988, which was before the renovation of the Airport had taken place. During this meeting, Mr. Graham said that the Airport terminal at that time was very congested and that newsracks would only exacerbate the congestion. Mr. Graham also stated that, in his opinion, the gift shop adequately handled existing demand for newspapers at the Airport. Mr. Brandt asked about the possibility of placing newspaper vending machines in the terminal after the renovation had been completed. Mr. Graham said that he had no objection to this idea in principle. Ms. Davis asked about placing newsracks in the parking garage, and Mr. Graham indicated that he had no problem with that idea. Mr. Graham said that he would bring up the newspapers' request for discussion at the next meeting of the Airport Commission.

14. On December 7, 1988, Mr. Brandt called Mr. Graham to see what the Commission had decided. Mr. Graham said that he had discussed the request with the Commission, and that he did not want to put newsracks in the terminal at that time. He said, however, that he had contacted the architects in charge of the renovation about designing an area for newsracks which would not mar the aesthetics of the terminal. Mr. Graham said that the new concourses would be open in late 1989 and that the newspapers could expect to be in them at that time. Mr. Graham asked Mr. Brandt just to be patient. In response to a question from Mr. Brandt, Mr. Graham said that newsracks could be put in the parking garage as soon as it was finished, which would be in early 1989.

15. After the November 2 meeting, Mr. Graham called Michael Keselica, the chief architect, to discuss how newspaper vending machines might be placed in the terminal in a manner consistent with the overall Airport design. Mr. Keselica had a number of questions concerning the type, number, and location of the proposed newsracks. Mr. Graham never responded. In Mr. Keselica's words, "at that point the matter was dropped. We didn't speak any further about it." Mr. Graham had one later conversation with Mr. Keselica, in which they discussed placement of newsracks outside of the terminal, but Mr. Graham still had no answers to Mr. Keselica's questions. According to Mr. Keselica, "[t]he matter was not discussed further and it just didn't come up again." When Mr. Keselica later attempted to follow up on the issue, he found out that Mr. Graham had retired and that Gary Jackson had replaced him. Mr. Jackson informed Mr. Keselica that the Airport was going to allow newsracks only in the parking garage. That was the end of Mr. Keselica's involvement in the matter.

16. After hearing nothing for nearly a year, Mr. Brandt set up a meeting with Mr. Jackson on November 29, 1989, to discuss again the newspaper's desire to place vending machines in the terminal. Mr. Jackson said that they were still considering allowing newsracks in the parking garage, but that they had not been able to find a suitable location in the terminal. Mr. Brandt pressed his case, but Mr. Jackson categori-

cally refused to allow newsracks anywhere in the terminal under any circumstances.

17. Mr. Brandt wrote a letter to the Chairman of the Airport Commission on January 25, 1990, renewing his request to allow newsracks in the terminal. Mr. Brandt received no response to his letter.

18. In the course of his communications with Mr. Graham, Mr. Jackson, and the Commission Chairman, Mr. Brandt offered to customize the newsracks so that they would not detract from the aesthetics of the terminal. Mr. Brandt received no response to these offers, other than the repeated refusals to allow any newsracks, in any shape or form, in the terminal.

19. In the spring of 1990, *The Spartanburg Herald–Journal* joined in The Greenville News–Piedmont Company's efforts to obtain access to the Airport terminal. The requests of the Spartanburg newspaper also were refused.

20. Neither Mr. Graham nor Mr. Jackson ever brought the newspapers' requests to the consideration of the Airport Commission. Other than making isolated reports to the Chairman of the Commission, neither Mr. Graham nor Mr. Jackson ever discussed the issue with the Commission or its Chairman. Neither the Commission nor its Chairman ever made any decision, recommendation, or suggestion concerning the newsrack issue. Other than the vague discussions with Mr. Keselica, neither Mr. Graham, Mr. Jackson, nor the Commission made any investigation into the feasibility of placing newsracks in the Airport terminal. The Airport's Deputy Director, Chief of Police, Gift Shop Manager, and Terminal Supervisor had no involvement with the decision to refuse newsrack access to the terminal.

21. The reasons proffered by Mr. Graham and Mr. Jackson for refusing to allow newsracks in the terminal are: (a) the gift shop and parking garage are adequate; (b) newsracks would mar the aesthetics of the terminal; (c) the presence of newsracks would cause the sales revenues of the gift shop to fall; (d) newsracks pose a safety hazard because they congest pedestrian traffic; and (e) newsracks are a security risk because they provide potential locations for bombs.

22. These reasons are pretextual. The truth is that Mr. Graham and Mr. Jackson failed to follow up on possible ways in which newsracks could be placed in the terminal without affecting the interests for which they professed to be concerned. Mr. Graham asked Mr. Keselica to check into such possibilities, but then neither he nor Mr. Jackson followed up. It was not until after this lawsuit was brought that Mr. Jackson made up his list of reasons for excluding newsracks. This was simply a *post hoc* justification for a decision that he had already made, on his own and without any consultation with the Commission, its Chairman, its architects, or other Airport officials. Security, safety, and gift shop revenue were not even mentioned by Mr. Graham or Mr. Jackson as a concern of the Airport in their meetings and communications with Mr. Brandt. Moreover, the fact that Mr. Graham said that he would ask the architect to look into the placement of newspaper vending machines suggests that Mr. Graham's only concern was aesthetics. Finally, the Airport's contract with the gift shop expressly states that the gift shop's license to distribute newspapers and magazines is non-exclusive. Thus, when the Airport entered into its contract with the gift shop, it reserved the right to allow news sales elsewhere in the terminal.

23. There is no industry standard regarding newsracks in airports. In the Southeast, newsracks are allowed in the airport terminals in Columbia, South Carolina; Charlotte, North Carolina; Atlanta, Georgia; and Columbus, Georgia.

24. Newsracks may be located and designed so as not to detract from the aesthetics of the Airport.

25. Based on considerations of traffic flow and space available, there are numerous locations in the Airport where newsracks could be placed without obstructing the flow of traffic. The defendants introduced no hard evidence to support their contention that allowing newsracks in the terminal would pose a threat to public safety.

26. The Airport has never experienced a terrorist incident or had a bomb exploded in it. There is no evidence that a newsrack has ever been used in any airport in the United States for the placement of a bomb. Newsracks are subject to random and frequent access by the public and by the newspaper distributors, in contrast with other containers in public areas in the Airport where explosives could be hidden and not discovered quickly, such as trash receptacles, fire extinguisher closets, other unlocked closets, luggage carts, and the underside of furniture such as the numerous tables, chairs, and desks throughout the terminal. In the highly unlikely event that someone would choose this Airport as the target of a bombing, it is extremely unlikely that he would place the bomb in a newsrack.

27. The Federal Aviation Administration has no safety or security regulations addressed to newsracks. In fact, in response to an inquiry from Mr. Jackson, the FAA stated in a letter dated February 4, 1991, that placement of newsracks is within the Airport's discretion. The FAA letter recommended only that locked containers *which cannot be visually checked* be located to the sterile area beyond the security checkpoints.

28. Security concerns regarding newsracks can be adequately addressed by requiring newsracks to be designed so as to allow an easy and complete viewing of the interior and contents of the newsrack. Such action would render the newsracks safer than the numerous planters and trash containers located throughout the Airport.

29. At trial the plaintiffs' witnesses testified concerning eight specific locations at which they would like to place newsracks: three in each concourse, one in the ticket area by the information booth, and one in the baggage claim area. Newsracks located in these eight areas would not adversely affect the aesthetics, safety, or security of the Airport.

30. There is no evidence that allowing newsracks in the terminal would cause the Airport gift shop to lose revenue. To the contrary, evidence presented by the plaintiffs indicates that newspaper availability generates its own demand and creates its own sales. It is just as likely that gift shop sales will benefit from the advertising effect of having newsracks in the terminal as it is that they will drop from increasing the availability of newspapers.

31. The gift shop is inadequate in the following respects: (a) its hours of operation are limited; (b) passengers may not see it if they leave or arrive through Concourse A; (c) it is a substantial distance from the gate areas; (d) Airport signs do not direct passengers to the gift shop from various parts of the terminal; and (e) newspapers for sale in the gift shop are placed in the back of the shop.

32. The newsracks in the parking garage are inadequate in the following respects: (a) arriving passengers who do not park in the parking garage will not see the newsracks; (b) departing passengers who are leaving the airport by taxi or limousine, who are being picked up in front of the Airport, or who parked in one of the uncovered parking lots will not see the newsracks; (c) arriving passengers who park in the parking garage may not think about buying a newspaper until after they have checked in, because they are concerned when they arrive about checking their baggage and obtaining their boarding pass in time; (d) passengers who are changing planes at the Airport will not see the newsracks; and (e) the only sign at the Airport which informs people of the newsracks in the garage is a sign placed on the outside of the gift shop when the gift shop is closed.

33. Increasing the availability of local newspapers in the Airport by allowing newsracks in the terminal would enhance and support the State's efforts to attract new business to the State by providing visiting businessmen with hard information about the local communities, in a form that is readily accessible and transportable.

## CONCLUSIONS OF LAW

### I. Jurisdiction

The subject matter of this lawsuit falls within the Court's federal question jurisdic-

tion, 28 U.S.C. § 1331, as well as its jurisdiction under 28 U.S.C. § 1343(a)(3), which provides for original jurisdiction over civil actions commenced to redress the deprivation, under color of state law, of any right, privilege, or immunity secured by the United States Constitution.

## II. Eleventh Amendment Immunity

■ The defendants have pleaded the Eleventh Amendment as a bar to this action. This defense fails for two reasons. First, the South Carolina statute which created the Airport District, S.C.Code Ann. § 55–11–110 (Law. Co-op.1976), expressly authorizes the Airport District to be sued in its name, without any limitation. This statute thus waives any Eleventh Amendment immunity as to the Airport District. Second, because the plaintiffs seek only injunctive relief and have named Mr. Jackson in his official capacity as a defendant, under the fiction of *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), the Eleventh Amendment does not apply.

## III. Violation of the First Amendment [2]

■ Two other district courts have considered the same issue presented by this case, albeit in the contexts of different airports. In one case, the district court ruled that the refusal to allow newsracks in the airport did not violate the constitutional rights of the newspapers. *Gannett Satellite Information Network, Inc. v. Berger*, 716 F.Supp. 140 (D.N.J.1989), *aff'd in part and rev'd in part*, 894 F.2d 61 (3d Cir. 1990). In the other case, the district court held that such action was a violation of the newspapers' First Amendment rights. *Chicago Tribune Co. v. City of Chicago*, 705 F.Supp. 1345 (N.D.Ill.1989).

This Court finds the reasoning of the *Chicago Tribune* decision more persuasive. In addition, many of the facts underlying the decision in the *Berger* case are not present here. For these reasons, the Court holds that the plaintiffs are entitled under the First Amendment to have access to the Airport terminal for their newsracks.

### A. The Sale of Newspapers Through Newsracks Is Protected by the First Amendment

■ The First Amendment guarantees of freedom of speech and press protect the distribution and circulation of a newspaper. In *Lovell v. City of Griffin*, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938), the United States Supreme Court emphasized that "[l]iberty of circulating is as essential to [freedom of the press] as liberty of publishing; indeed, without the circulation, the publication would be of little value." *Id.* at 452, 58 S.Ct. at 669. It is immaterial whether the dissemination of a publication takes place under commercial auspices. *Smith v. California*, 361 U.S. 147, 150, 80 S.Ct. 215, 217, 4 L.Ed.2d 205 (1959). The constitutional protection accorded written material does not change merely because it is sold rather than given away. *See Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640, 647, 101 S.Ct. 2559, 2563, 69 L.Ed.2d 298 (1981).

Without question, distribution of plaintiffs' newspapers is protected by the First Amendment. *See Lovell, supra*, 303 U.S. at 452, 58 S.Ct. at 669. In addition, it has been held, in a variety of factual settings, that the right to distribute newspapers by means of newsracks also falls within the ambit of First Amendment protections. *See, e.g., Gannett Satellite Information Network, Inc. v. Metropolitan Transportation Authority*, 745 F.2d 767, 772 (2d Cir.1984); *Miami Herald Publishing Co. v. City of Hallandale*, 734 F.2d 666, 673 (11th Cir.1984); *Chicago Newspaper Publishers Ass'n v. City of Wheaton*, 697 F.Supp. 1464, 1466 (N.D.Ill.1988); *Providence Journal Co. v. City of Newport*, 665 F.Supp. 107, 110 (D.R.I.1987). Even the court in the *Berger* case recognized that the distribution of newspapers through newsracks in airport terminals is protected by the First Amendment. *Berger*, 716 F.Supp. at 146–47.

Thus, it is clear that the First Amendment applies to the defendants' refusal to

---

**2.** The discussion concerning the First Amendment applies equally to plaintiffs' cause of ac-

tion under Article I, Section 2 of the South Carolina Constitution.

allow newsracks in the Airport. The question remains whether that refusal constitutes a violation of the plaintiffs' rights under the First Amendment.

B. The Airport Terminal Is a Public Forum

 The appropriate test for determining whether the defendants' total ban against newsracks is constitutionally permissible depends on whether the Airport terminal is a public forum or a nonpublic forum. *Berger, supra,* 716 F.Supp. at 148–49; *Chicago Tribune, supra,* 705 F.Supp. at 1347. The federal courts have generally agreed that airport terminals owned and administered by governmental entities are public forums. See the numerous cases cited in *Berger, supra,* 716 F.Supp. at 149.

The defendants admit in their Answer that the Airport is a public airport and that it is operated by a governmental entity. Access to the terminal is unrestricted and open to the public.[3] The terminal contains a bank, a travel agent office, airline ticket counters, rental car agency bureaus, a restaurant, a bar, a gift shop, public telephones, public restrooms, and numerous public seating areas and walkways. Given the similarities between the Airport terminal and such traditional public forums as streets, parks, and the ancient city gates, this Court joins the other federal courts that have addressed this issue and holds that the Airport terminal is a public forum.

C. The Total Prohibition of Newsracks Is Not A Valid Time, Place, and Manner Restriction

 Because the Airport is a public forum, the defendants' right to regulate First Amendment activity is minimal. A total prohibition of First Amendment activity must be the least restrictive means of protecting a compelling government interest. A time, place, and manner restriction is permissible only as long as it is content neutral, is narrowly drawn to serve a significant government interest, and leaves open ample alternative means for First Amendment expression. *Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983). In this case, the defendants have not banned newspapers altogether from the Airport terminal; they are available at the gift shop. Therefore, the Court must determine whether the prohibition of newsracks is a valid time, place, and manner restriction.

*1. The Refusal Is Content Neutral*

The defendants' refusal applies to all newsracks and is therefore content-neutral. *See, e.g., Chicago Newspaper Publishers, supra,* 697 F.Supp. at 1469.

*2. The Refusal Is Not Narrowly Drawn*

The defendants have articulated four interests in support of their refusal to allow newsracks in the terminal: aesthetics, revenue, safety, and security. The Court accepts these interests as significant governmental interests. *Berger, supra,* 716 F.Supp. at 150–51. Simply identifying significant governmental interests, however, does not end the inquiry. The defendants also must show that there is a significant relationship between the restriction and the governmental interests, and that the means employed are the least restrictive available.

"[I]f there is a less restrictive alternative to a challenged regulation, then the ordinance is not as precise and narrowly drawn as it could be, and the regulation unnecessarily interferes with First Amendment rights."

*City of Watseka v. Illinois Public Action Council,* 796 F.2d 1547, 1553 (7th Cir.1986),

---

**3.** The defendants presented testimony that access to the concourses recently was limited to ticketed passengers and persons with security clearance. The testimony indicated, however, that this restriction is a temporary security precaution. Moreover, the restriction is immaterial, since the defendants have prohibited newsracks throughout the terminal, not just in the concourses. Finally, even if this restriction were permanent and pertinent, it would serve only to make the concourses a limited public forum (such as a municipal auditorium or theatre). The same legal analysis applies to time, place, and manner restrictions in limited public forums as in traditional public forums. *E.g., Berger, supra,* 716 F.Supp. at 148–49.

*aff'd,* 479 U.S. 1048, 107 S.Ct. 919, 93 L.Ed.2d 972 (1987); *see also id.* at 1553–54; *Chicago Newspaper Publishers, supra,* 697 F.Supp. at 1469. The defendants have failed to make that showing.

As a general matter, the Court has held as a finding of fact that all of the interests proffered by defendants in support of their refusal are a pretext, a *post hoc* justification of a bureaucratic unwillingness to explore alternatives. Thus, there is not a significant relationship between the prohibition of newsracks and the interests supposedly at stake. Even on their own terms, however, the defendants' reasons do not bear up under scrutiny.

As to aesthetic concerns, "simply uttering the words aesthetics or appearance should [not] magically alleviate any need for evidence connecting the regulation to the state interest, particularly where fully protected First Amendment interests are at stake." *Southern New Jersey Newspapers, Inc. v. New Jersey Department of Transportation,* 542 F.Supp. 173, 186 (D.N.J.1982). The plaintiffs have offered to customize their newsracks so that they will fit in with the overall aesthetic design of the Airport terminal. Moreover, there are numerous locations in the terminal where newsracks would be unobtrusive. Specifically, placing appropriately painted newsracks in the eight locations desired by the plaintiffs would not detract from the Airport's beauty. Indeed, one could justifiably maintain that such placements would enhance the overall atmosphere of the Airport. For these reasons, a total prohibition of newsracks in the terminal is not the least restrictive means of protecting defendants' aesthetic concerns.

Defendants' contention that newsracks in the terminal would cause the gift shop to lose revenue is utterly speculative. There is no evidence to support the claim. Furthermore, it is logically fallacious to assert that every newspaper sold from a newsrack translates into a lost sale for the gift shop. It is just as likely that newsracks will increase sales revenue at the gift shop by inducing people who do not have the change to buy a paper from a newsrack to go to the gift shop.

As to defendants' concern that newsracks would create a safety problem by causing congestion of pedestrian traffic, the Court finds that there are numerous areas in the terminal where newsracks would be out of the flow of traffic, including the eight locations identified by the plaintiffs. The defendants have failed to produce any evidence to substantiate their claim that allowing *any* newsracks *anywhere* in the terminal will create a safety hazard.

Lastly, for the reasons stated in the Findings of Fact, the Court considers it extremely unlikely that someone would use a newsrack at the Airport to plant a bomb. There is no evidence that a newsrack has ever been used in any airport in the United States for the placement of a bomb. The fact that other airports allow newsracks in their terminals indicates that newsracks are not a security hazard. This conclusion finds further support in the fact that the Federal Aviation Administration leaves control of newsracks within the Airport's discretion. If defendants are truly concerned about the potential use of newsracks as bomb sites, that concern can be adequately addressed by requiring newsracks to be designed so as to allow an easy and complete viewing of the interior and contents of the newsrack. A total prohibition is unnecessary.

The burden is on defendants to demonstrate how their refusal to allow any newsracks, in any form, anywhere in the terminal, is narrowly tailored. *Chicago Newspaper Publishers, supra,* 697 F.Supp. at 1470. Defendants have failed to carry their burden.

### 3. The Refusal Does Not Leave Open Ample Alternative Channels of Expression

In the Findings of Fact above, the Court has identified numerous respects in which the present availability of newspapers through the gift shop and the newsracks in the parking garage is not adequate. These facts make this case markedly different

from the facts in the *Berger* case, *supra,* in which the district court upheld a ban on newsracks in the terminal of the Newark Airport. At the Newark Airport, numerous newsstands are located throughout the terminal; signs throughout the terminal direct the public to newsstand locations; arriving and departing passengers have to walk close to the newsstands; and the hours of the newsstands cover all scheduled arrivals and departures except for two late arrivals. *Berger, supra,* 716 F.Supp. at 155. In the instant case, given the numerous inadequacies of the gift shop and parking garage newsracks, the Court cannot conclude that Airport patrons have adequate access to newspapers through the existing channels.

### IV. Irreparable Harm

■ The denial of plaintiffs' First Amendment right to distribute their newspapers in a public forum constitutes an irreparable injury that cannot be remedied by monetary damages. *E.g., Jacobsen v. United States Postal Service,* 812 F.2d 1151, 1154 (9th Cir.1987); *Chicago Tribune Co. v. City of Chicago,* 705 F.Supp. 1345, 1348 (N.D.Ill.1989). Accordingly, the plaintiffs are entitled to injunctive relief.

### CONCLUSION

For the reasons stated above, the Court concludes that the defendants' categorical refusal to allow newsracks in the Airport terminal is a violation of the plaintiffs' constitutional rights of free speech and press, that this violation constitutes irreparable harm, and that injunctive relief is warranted.

IT IS, THEREFORE, HEREBY ORDERED as follows:

(a) The defendants are enjoined to allow the plaintiffs to place newsracks in the terminal in the eight locations identified by the plaintiffs' witnesses at trial.

(b) Within five (5) days of the date of this Order, the plaintiffs shall present the defendants with at least four (4) alternative generally available newsrack designs. The defendants may then specify which of the alternatives, if any, they prefer. If the defendants specify one or more alternatives, the plaintiffs must use the alternative(s) specified. The defendants may also specify the desired color(s) of the newsracks; if they do so, the plaintiffs must use newsracks of the color(s) specified. If the defendants do not specify which design(s) or color(s) they prefer within five (5) days after the plaintiffs present them with the alternative designs, the plaintiffs may use newsracks of any design or color, as the case may be.

It is so ordered.