**MULTIMEDIA PUBLISHING COMPANY OF SOUTH CAROLINA, INCORPORATED; New York Times Company, Plaintiffs–Appellees,**

v.

**GREENVILLE–SPARTANBURG AIRPORT DISTRICT; Gary Jackson, in his official capacity as Executive Director of the Greenville–Spartanburg Airport Commission, Defendants–Appellants.**

No. 91–1575.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 2, 1992.

Decided April 22, 1993.

Stanley Turner Case, Butler, Means, Evins & Browne, Spartanburg, SC, argued (Edward G. Smith, on brief), for defendants-appellants.

Wallace K. Lightsey, Wyche, Burgess, Freeman & Parham, P.A., Greenville, SC, argued (Carl F. Muller, on brief), for plaintiffs-appellees.

Before PHILLIPS and WILKINS, Circuit Judges, and SPROUSE, Senior Circuit Judge.

## OPINION

PHILLIPS, Circuit Judge:

The issue is whether a total ban imposed by the Greenville–Spartanburg Airport Commission (the Commission) on the placement of newspaper vending machines (newsracks) inside its airline terminal violated the First Amendment rights of two newspaper companies who challenged the ban in this action. The district court, holding that the terminal was a public forum and applying the First Amendment principles then relevant to that forum classification, declared the total ban unconstitutional and entered a remedial decree compelling the Commission to permit placement of newsracks in certain designated areas of the terminal. Though during pendency of this appeal it was established in *International Soc'y for Krishna Consciousness, Inc. v. Lee,* —— U.S. ——, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992), that airline terminals of the sort here in issue are not public forums, we conclude that the total ban here challenged is nevertheless unconstitutional and we therefore affirm the district court's decision to that effect. Because we further conclude, however, that the Commission should have an opportunity to be heard on the issue of an appropriate remedial decree under the principles announced in *Lee,* we vacate the remedial portion of the decree and remand the case for reconsideration of that issue.

I

Multimedia Publishing Company of South Carolina publishes the *Greenville News* and the *Greenville Piedmont,* both daily newspapers in South Carolina. The New York Times Company publishes the *Spartanburg Herald–Journal,* also a South Carolina daily.

The Commission oversees operation of the Greenville–Spartanburg Airport, located ten miles north of Greenville, South Carolina and fifteen miles south of Spartanburg, South Carolina. Approximately one million passengers pass through the Airport each year, and a recent renovation designed to better accommodate those passengers expanded the Airport to twice its former size. In the new facility a spacious lower lobby contains ticketing and baggage claim areas, along with a bank, a travel agency office, rental car bureaus, a large fountain, and seating areas interspersed with planters and trash containers. Escalators ascend from the lower lobby to a middle level containing a gift shop, a bar, a restaurant, public telephone booths, vending machines, and an outdoor terrace for watching planes take off and land. Two large concourses extend in opposite directions from the middle-level lobby, each containing four gates, seating areas surrounded by planters and trash containers, public restrooms, and desks with individual telephones and work areas for departing and arriving passengers. The public generally has free access to the central terminal, and all persons wishing to enter the Airport's gate area may do so if they are willing to pass through the metal detectors separating it from the central terminal.

During the fall of 1988, before renovation of the Airport began, Multimedia contacted Dick Graham, then Executive Director of the Commission, requesting permission to place newsracks in the passenger terminal building. Newspapers were then available only in the gift shop, and Multimedia had received complaints from business people in Greenville who weren't able to purchase them when arriving or departing outside the shop's hours of operation. Graham told Multimedia he didn't want to increase congestion in the small existing terminal by placing newsracks inside, but he promised to consult the renovation architects about providing newsrack space in the renovated facility and led the companies to believe they could expect to place newsracks inside it.

Although Graham did ask the architect to consider newsrack placement, neither he nor his successor, Gary Jackson, pursued the matter further. When the architect contacted Jackson after renovation was under way, Jackson told him not to worry about newsracks because they wouldn't be permitted inside the new terminal.

In November of 1989, when renovation was nearly complete, Multimedia asked Jackson when newsracks could be placed inside the new terminal. Citing aesthetic concerns, he flatly refused to permit newsracks in the Airport, although he later allowed the newspaper companies to place them in one of the Airport's several parking areas.

In pressing for permission to place newsracks inside the Airport, Multimedia had offered to customize them under the direction of the architect to avoid detracting from the new terminal's aesthetics. Specifically, Multimedia had offered to paint them special colors or place them inside wooden cabinets. Jackson never presented these offers to the Commission, and, in-

deed, consulted no one regarding the feasibility of customizing the newsracks to complement the Airport's decor.

Ultimately, the New York Times Company joined Multimedia's efforts, and the newspaper companies brought this action. Jackson, acting alone, then prepared a list of justifications for banning newsracks. He claimed that they would mar the aesthetics of the terminal, cause gift-shop revenues to decrease, pose a pedestrian safety hazard, and constitute a security risk because they might hold bombs. He also said newsracks were unnecessary because adequate alternative means of distributing newspapers existed.[1]

In a non-jury trial the district court found that the First Amendment protects distribution of newspapers through newsracks. *Multimedia Publishing Co. v. Greenville–Spartanburg Airport Dist.*, 774 F.Supp. 977, 983–84 (D.S.C.1991). It also determined that, for purposes of disseminating news, the Greenville–Spartanburg Airport is a public forum. *Id.* at 984. Finally, because the Commission's ban couldn't withstand the strict scrutiny applied to such regulations in a public forum, the district court concluded that it violated the newspaper companies' First Amendment rights. *Id.* at 984–86. Accordingly, it enjoined the Commission to permit the newspaper companies to place newsracks in eight locations inside the terminal building. *Id.* at 986. The Commission appealed.

We first heard oral argument in this appeal on October 29, 1991, but placed the case in abeyance pending the Supreme Court's decision in *Lee*. Following the entry of that decision which held, among other things, that public airports aren't public forums, *see* —— U.S. at ——, 112 S.Ct. at 2706; —— U.S. at ——, 112 S.Ct. at 2711, (O'Connor, J., concurring),[2] we ordered sup-

---

**1.** Though Jackson came up with these justifications after the fact without consulting his superiors or any advisors, both parties relied upon them at trial as the Commission's official assertion of the governmental interests justifying the ban, and the district court accordingly so treated them.

**2.** The opinion of the Court reported at —— U.S. ——, 112 S.Ct. 2701 upheld a ban on solicitation in the airport terminal. The Court's opinion was written by Chief Justice Rehnquist and joined by Justices White, O'Connor, Scalia, and Thomas. Justice Kennedy concurred in the judgment, —— U.S. at ——, 112 S.Ct. at 2715, and Justice Souter, joined by Justices Blackmun and Stevens, dissented with respect to that is-

plemental briefs, and later oral argument, with respect to *Lee's* impact on this case.

## II

To determine the constitutionality of the Commission's newsrack ban involving restrictions on the use of public property, we first have to decide whether the distribution of newspapers through newsracks located on that property is entitled to First Amendment scrutiny at all. *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 797, 105 S.Ct. 3439, 3446, 87 L.Ed.2d 567 (1985). If not, the ban would have to be sustained, and our inquiry would be over. If, however, such distribution is under First Amendment protection, two further questions are raised: (1) What type of forum for First Amendment purposes is this public property? and (2) Can the challenged ban survive the constitutional scrutiny appropriate to the regulation of expression in that type of forum? *Id.*

## A

■■■■ The Commission argues that its regulation of newsrack distribution in the Airport doesn't implicate First Amendment protections in the first place. All this ban concerns, says the Commission, is state regulation of a particular mode of commercial distribution involving physical invasion of public property.

Things aren't so simple. It's long been settled that the First Amendment protects distribution as well as publication of protected material. *Lovell v. City of Griffin*, 303 U.S. 444, 452, 58 S.Ct. 666, 669, 82 L.Ed. 949 (1938) (distribution as well as publication of literature subject to First Amendment protection); *Ex parte Jackson*, 96 U.S. 727, 733, 24 L.Ed. 877 (1878) ("Liberty of circulating is as essential to [freedom of expression] as liberty of publishing; indeed, without the circulation, the publication would be of little value."). Moreover, it's clear that modes of distribu-

tion involving permanent or semi-permanent occupation of publicly-owned property don't lose First Amendment protection because of that fact, *City of Cincinnati v. Discovery Network, Inc.*, —— U.S. ——, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993) (invalidating city's ban on newsracks for commercial speech); *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 769, 108 S.Ct. 2138, 2150, 100 L.Ed.2d 771 (1988) (licensing of newsrack placement on public streets subject to First Amendment challenge); *see also Plain Dealer Publishing Co. v. City of Lakewood*, 794 F.2d 1139, 1143 (6th Cir.1986), *aff'd in part and remanded*, 486 U.S. 750, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988); *Gannett Satellite Info. Network, Inc. v. Metropolitan Transp. Auth.*, 745 F.2d 767, 772 (2d Cir. 1984); *Miami Herald Publishing Co. v. City of Hallandale*, 734 F.2d 666, 673 (11th Cir.1984), though the character of the distributive technique may bear on the degree of protection accorded and whether a ban may ultimately be sustained. *Discovery Network*, —— U.S. at ——, 113 S.Ct. at 1516 (assuming *arguendo* that complete ban might be permissible in certain circumstances but striking down more limited ban in question as violating First Amendment); *City of Lakewood*, 486 U.S. at 762 n. 7, 108 S.Ct. at 2147 n. 7 (reserving judgment on whether newsracks could be banned from city sidewalks altogether while nonetheless striking down licensing ordinance for violating First Amendment). We therefore reject the Commission's initial contention and consider its ban on newsracks under established First Amendment forum analysis.

## B

■■■■ Although the question whether public airport terminals are public fora was open when we first heard argument in this case, the Supreme Court has since resolved the question, holding that they are not. *Lee*, —— U.S. at ——, 112 S.Ct. at 2706.

sue. —— U.S. at ——, 112 S.Ct. at 2724. The Court struck down a companion ban on leafletting in a brief *per curiam* captioned *Lee v. International Soc'y for Krishna Consciousness, Inc.*, —— U.S. ——, 112 S.Ct. 2709 (1992), for the

reasons expressed in the opinion of Justice O'Connor, —— U.S. ——, 112 S.Ct. at 2711, and the opinions of Justices Kennedy and Souter mentioned above.

Because its determination was categorical, *cf. Lee,* —— U.S. at ——, 112 S.Ct. at 2724 (Souter, J., dissenting) (suggesting noncategorical approach), we hold that the Greenville–Spartanburg Airport terminal is not a public forum.

## C

■ The First Amendment's protection extends beyond the public forum, however, and the government's power to regulate expressive activity on public property not having that quality—like the Greenville–Spartanburg Airport—is still limited. The relevant constraints are identified in *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 46, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983): "In addition to time, place, and manner regulations, the State may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." Because neither party suggests that the Commission's ban discriminates based on viewpoint, only the former criterion, reasonableness, is at issue here.

■ While the Commission's decision to restrict protected First Amendment activity in the nonpublic forum must be reasonable, "it need not be the most reasonable or the only reasonable limitation." *Cornelius,* 473 U.S. at 808, 105 S.Ct. at 3452. But it isn't enough simply to establish that the regulation is rationally related to a legitimate governmental objective, as might be the case for a typical exercise of the government's police power, *see Williamson v. Lee Optical,* 348 U.S. 483, 488, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955), for this regulation affects protected First Amendment activity that is entitled to special solicitude even in this nonpublic forum. In this context, the reasonableness of a challenged regulation must be assessed "in the light of the purpose of the forum and all the surrounding circumstances." *Cornelius,* 473 U.S. at 809, 105 S.Ct. at 3453.

■ There are several obvious considerations in such an assessment. The degree and character of the impairment of protected expression involved, discounted by any mitigating alternatives that remain to the aggrieved party, must be considered. *See Lee,* —— U.S. at ——, 112 S.Ct. at 2708–09; *Cornelius,* 473 U.S. at 809, 105 S.Ct. at 3453. The validity of any asserted justification for the impairment must then be assessed and, if found valid, then weighed in the balance against the impairment. *See id.; Lee,* —— U.S. at ——, 112 S.Ct. at 2713–14 (O'Connor, J., concurring). Because regulations other than mere time, place, and manner restrictions must be designed to "reserve the forum for its intended purposes," the overall assessment must be undertaken with an eye to the "intended purposes" of this particular airport terminal and of the ways in which the regulated conduct—here the placement of newsracks—might actually interfere with the carrying out of those purposes.

We now turn to that assessment.

### 1

■ The Commission's blanket ban on the placement of newsracks within the terminal substantially burdens the newspaper companies' expressive conduct within that public space. In fact, were no alternative channels for newspaper distribution available in the general area, no heavier burden would be conceivable. But two alternative channels are available: the Airport gift shop and racks in one of the Airport's parking facilities. Their actual utility as alternatives is, however, limited in critical ways.

The Airport's gift shop concession does sell newspapers, but its hours of operation (presently 6:30 a.m. to 9:00 p.m.) are limited, and about a dozen flights arrive or depart outside them. Moreover, while passengers arriving at or departing from Concourse B must pass by the shop, passengers using Concourse A may not see it at all. If they don't, no signs will lead them to it; there aren't any. The gift shop is also a substantial distance from the gate areas, making the quick access often essential to air travellers difficult, even for pa-

trons who know where it is. These short-comings are compounded by the gift shop's practice of displaying the papers flat and in the back of the shop.

Papers are also available from news-racks in the parking garage. But the garage is only one of several parking options for Airport patrons, and arriving or departing passengers who park elsewhere, as well as the many who don't park at all, won't see the racks. The only notice of the racks' existence is a sign displayed by the gift shop when it is closed. Moreover, even those arriving passengers who do use the garage and see the racks may not think to purchase a newspaper before they enter the Airport, particularly if they haven't used it before and aren't aware of the limited availability of newspapers within.

Despite these two alternatives, then, the Commission's newsrack ban makes newspapers hard to come by for many patrons of the Greenville–Spartanburg Airport and impossible for others, thereby placing a heavy burden on the newspaper companies' protected distribution activity. This burden is enhanced by the tightly contained character of the Airport environment. If a governmental entity imposed a similar ban on newsrack placement on city streets and sidewalks, those desiring a paper might find private vendors on nearby private property taking advantage of a newly created market; but the Airport's ban offers no similar opportunity for patrons or vendors. The Commission administers *all* the surrounding property readily accessible to Airport patrons, and market forces don't operate on its one retail monopoly.

### 2

■ Although the burden on protected expression imposed by the Commission's ban is a heavy one, the Commission might nonetheless be able to advance sufficiently powerful governmental interests to justify it. Before considering the Commission's asserted interests, however, we need to address a preliminary dispute concerning the appropriate standard for reviewing the district court's factual findings respecting those interests. The Commission argues that *Bose Corp. v. Consumers Union*, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984), requires that in this First Amendment case, we should review such findings independently, while the newspaper companies contend that *de novo* review is required only where a district court decision has left expressive activity unprotected and not, as here, where it has protected the activity.

We agree with the newspaper companies. The *Bose* requirement of independent review doesn't apply to the Commission's claim that it has been wrongly prevented from restricting speech. *See Planned Parenthood Ass'n/Chicago Area v. Chicago Transit Auth.*, 767 F.2d 1225, 1229 (7th Cir.1985); *Daily Herald Co. v. Munro*, 838 F.2d 380, 383 (9th Cir.1988). The requirement is rested upon "special solicitude for claims that the protections afforded by the First Amendment have been unduly *abridged,"* *Planned Parenthood*, 767 F.2d at 1229 (emphasis added), requiring appellate courts "to make an independent examination of the whole record *in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'"* *Bose*, 466 U.S. at 499, 104 S.Ct. at 1958 (emphasis added) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 285, 84 S.Ct. 710, 729, 11 L.Ed.2d 686 (1964)). To the extent the district court's determinations respecting the Commission's asserted justifications for its ban constitute findings of fact, we apply the normal standard of review and sustain them absent clear error. Fed.R.Civ.P. 52(a).

The Commission has advanced four governmental interests to justify its ban: aesthetics, revenue, convenience and safety, and security.

■ To advance these interests, the Commission need not have adduced specific factual evidence that its interests were advanced by the ban or that the expressive activity banned did interfere with the forum's intended use; it was entitled to advance its interests by arguments based on appeals to common sense and logic. *Perry*, 460 U.S. at 52 n. 12, 103 S.Ct. at 959 n. 12;

*United States v. Kokinda,* 497 U.S. 720, 734–35, 110 S.Ct. 3115, 3124, 111 L.Ed.2d 571 (1990) (plurality op.). The district court rejected the Commission's arguments made on that basis, and the Commission has renewed those arguments here in challenging the district court's determinations. We review the court's rejection of the various interests with appropriate deference to its predicate fact findings.

█ The Commission argues that placing newsracks inside the terminal would generate visual clutter inconsistent with the aesthetic design of the Greenville–Spartanburg Airport, but it presented no articulable aesthetic design to the court or the newspaper companies. The district court rejected this justification as inconsistent with the evidence adduced at trial, which made clear that "[n]ewsracks may be located and designed so as not to detract from the aesthetics of the Airport" but that no effort to do so had been made. 774 F.Supp. at 981. We see nothing in common sense or logic—or in fact-finding error— that dictates a different conclusion.

While the government's interest in aesthetics is undoubtedly legitimate, *Members of City Council v. Taxpayers for Vincent,* 466 U.S. 789, 805, 104 S.Ct. 2118, 2129, 80 L.Ed.2d 772 (1984), the interest's assertion, without more, isn't sufficient to carry the day and permit the restriction of protected expression. *See Lee,* —— U.S. at ——, 112 S.Ct. at 2714 (O'Connor, J., concurring) (noting but disregarding asserted interest in avoiding litter). Courts faced with an asserted governmental interest in promoting aesthetic values must ask whether that interest is sufficiently substantial to justify its use as a basis for restricting protected expression. *Vincent,* 466 U.S. at 805, 104 S.Ct. at 2129. Where it has been found sufficient, the aesthetic harm has been both substantial and widely recognized, *id.* at 807, 104 S.Ct. at 2130 ("visual assault on the citizens of Los Angeles presented by an accumulation of signs"); *Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 510, 101 S.Ct. 2882, 2894, 69 L.Ed.2d 800 (1981) (plurality opinion) (billboards), and the speech restricted has often been of low First

Amendment value. *Id.* at 512, 101 S.Ct. at 2895 (after suggesting that aesthetic interest justifies outdoor advertising ban with respect to commercial speech, noting that ban might still falter with respect to noncommercial speech). Neither of those factors is present here. The district court correctly determined that the aesthetic threat posed by newsracks was unsubstantiated.

█ The Commission also presses its interest in preserving revenue derived from its concession on sales of newspapers at the Airport gift shop. The government's interest in preserving revenue generally has been recognized as legitimate, *Lehman v. City of Shaker Heights,* 418 U.S. 298, 304, 94 S.Ct. 2714, 2718, 41 L.Ed.2d 770 (1974), but the district court rejected it here because the record failed to demonstrate that the Airport's concessionary revenue would be reduced by the presence of newsracks and, in fact, suggested that increased patron awareness of newspaper availability might actually bolster sales at the gift shop in spite of rack alternatives. 774 F.Supp. at 982. That finding was not clearly erroneous.

Even if it were, however, we note the Commission's other options. It was under no obligation to preserve revenue at the gift shop, J.A. at 337–54, and it could have exacted a concession for papers sold from newsracks equal to that assessed against the shop, as long as the concession didn't exceed that levied for other types of goods sold in the Airport. *See Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue,* 460 U.S. 575, 586, 103 S.Ct. 1365, 1372, 75 L.Ed.2d 295 (1983). While the Commission need not choose the most reasonable regulation available to it, its failure to select this simple, available alternative suggests something about both the veracity of its asserted justification and the reasonableness of its blanket ban.

█ The Commission next contends that placement of newsracks in its facility poses a threat to patron safety and convenience by interposing obstacles to free movement within the Airport. Once again, we agree with the district court's conclu-

sion: "Based on considerations of traffic flow and space available, there are numerous locations in the Airport where newsracks ·could be placed." 774 F.Supp. at 981. The patron safety argument invokes the threat of traveller congestion around newsracks, but we think *common sense allays that fear.* The congestion dangers presented by a large number of peaceful leafletters seeking out passersby and attempting to engage them in dialogue weren't sufficient to justify banning the leafletting activity the Port Authority sought to ban in *Lee,* —— U.S. at ——, 112 S.Ct. at 2713–14 (O'Connor, J., concurring). That being so, the obviously trivial congestion-related difficulties posed by carefully placed inanimate newsracks cannot justify the Commission's ban either.

■ The Commission's final justification for its newsrack ban is airport security. The district court found this justification specious, and we think its findings are compelling:

The Airport has never experienced a terrorist incident or had a bomb exploded in it. There is no evidence that a newsrack has ever been used in any airport in the United States for the placement of a bomb. Newsracks are subject to random and frequent access by the public and by the newspaper distributors, in contrast with other containers in public areas in the Airport where explosives could be hidden and not discovered quickly.... In the highly unlikely event that someone would choose this Airport as the target of a bombing, it is extremely unlikely that he would place the bomb in a newsrack.

774 F.Supp. at 982. The Federal Aviation Administration has no safety or security regulations addressed to newsracks, and proper design would render them highly unsuitable for bomb placement. *Id.* The incremental danger to airport security posed by newsracks is entirely *de minimis.*

The district court did not err in determining that the governmental interests asserted as justification for the ban were *post hoc,* pretextual creations, which were not shown to have been significantly threatened by the conduct banned.

### 3

■ Expressive activity in nonpublic fora doesn't stand on the same footing as expressive activity in traditional public fora or the private arena. Nonpublic fora are primarily intended for the accomplishment of particular governmental purposes, and within their confines society's interest in free speech must sometimes yield to those purposes. If the threat of interference with the Airport's intended use posed by newsrack placement were sufficiently great, it might be possible to sustain the Commission's newsrack ban despite the insubstantiality of the specific justifications advanced by the Commission. We consider this possibility here.

"In contrast to a public forum, a finding of strict incompatibility between the nature of the speech or the identity of the speaker and the functioning of the nonpublic forum is not mandated." *Cornelius,* 473 U.S. at 808, 105 S.Ct. at 3452. This doesn't, however, leave the Commission free to ban all speech not directly advancing the forum's intended purpose. *See Board of Airport Comm'rs v. Jews for Jesus, Inc.,* 482 U.S. 569, 576, 107 S.Ct. 2568, 2573, 96 L.Ed.2d 500 (1987) ("Much nondisruptive speech— such as the wearing of a T–shirt or button that contains a political message—may not be "airport related," but is still protected speech even in a nonpublic forum."). The Commission is, instead, permitted to restrict speech to the degree reasonably necessary to preserve the forum for its intended use. *Lee,* —— U.S. at ——, 112 S.Ct. at 2714 (O'Connor, J., concurring); *Perry,* 460 U.S. at 50–51, 103 S.Ct. at 958.

With respect to a nonpublic forum's intended use, the proof is in the pudding. We look not simply at the government's assertions of purpose, but also at the facility's actual operation. *See Lee,* —— U.S. at ——, 112 S.Ct. at 2712 (O'Connor, J., concurring). There is of course no doubt that the primary intended purpose of the Greenville–Spartanburg Airport is to facilitate air travel, but it obviously has come to have

more purposes than that primary one. While not the commercial mecca created by the New York–New Jersey Port Authority as described in *Lee, see id.,* the Airport's numerous commercial adjuncts indicate that the Commission has intentionally devoted the facility to considerable commercial activity supportive of but essentially independent of the primary purpose.

■ Nothing in the evidentiary record of this case, or in the Commission's arguments, suggests that a reasonably controlled placement of a limited number of newsracks in this terminal would significantly, if at all, interfere with either the primary or secondary intended purposes of its operation. That they would be relatively "permanent" does not appear at all relevant on that point. In many ways their inanimate, unobtrusive nature is bound to be much less disruptive of passenger sensibilities and physical movement than are the assertive leafletting activities held in *Lee* to be protected against airport ban.

### III

Taken together, the above inquiries demonstrate that the Commission's complete ban on newsracks in the Airport terminal violates the First Amendment. The ban impairs important expressive activity but fails to protect effectively the Airport's appearance, revenue, convenience, or security. This imbalance is in no way rectified by the Commission's preeminent interest in preserving its nonpublic forum for the intended use, because the Commission has shown no incompatibility at all between use of the Airport for its intended mission and reasonable placement of newsracks. Its position, really the position of its Executive Director, represents nothing more than the "bureaucratic unwillingness to explore alternatives" found by the district court. 774 F.Supp. at 985.

### IV

We therefore affirm the district court's decision declaring that the ban violates the First Amendment and must be lifted. We are concerned, however, that the remedial portion of the district court's decree was entered without benefit of the Commission's suggestion of possible alternatives to the specific decree entered. We are aware that this may have resulted from a deliberate decision by the Commission to stand on its position that no alternative to the complete ban was warranted. And we are aware that it would be perfectly fair and proper, if that were the case, to let the decree stand unless and until the Commission sought by motion in the cause to have it modified. In view, however, of the circumstances of this case's development, we believe justice will be better served by vacating the remedial portion of the decree and remanding the case for reconsideration of the proper remedial decree following an opportunity by both parties to be heard on its proper form in light of this opinion and of *Lee's* discussion of the nature of the airport forum as that may bear upon the issue. And it is so ordered.

AFFIRMED IN PART, VACATED AND REMANDED IN PART.