PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

THE NEWS AND OBSERVER
PUBLISHING COMPANY; THE DURHAM
HERALD COMPANY; THE NEW YORK
TIMES COMPANY; GANNETT
COMPANY, INCORPORATED,

        *Plaintiffs-Appellees,*

v.

RALEIGH-DURHAM AIRPORT
AUTHORITY,

        *Defendant-Appellant.*

No. 09-1010

THE NEWS AND OBSERVER
PUBLISHING COMPANY; THE DURHAM
HERALD COMPANY; THE NEW YORK
TIMES COMPANY; GANNETT
COMPANY, INCORPORATED,

        *Plaintiffs-Appellees,*

v.

RALEIGH-DURHAM AIRPORT
AUTHORITY,

        *Defendant-Appellant.*

No. 09-1231

Appeals from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
Terrence W. Boyle, District Judge.
(5:04-cv-00639-BO)

Argued: October 27, 2009

Decided: March 12, 2010

Before WILKINSON, DUNCAN, and DAVIS,
Circuit Judges.

---

Affirmed by published opinion. Judge Duncan wrote the
majority opinion, in which Judge Wilkinson concurred. Judge
Davis wrote a dissenting opinion.

---

**COUNSEL**

**ARGUED**: James P. McLoughlin, Jr., MOORE & VAN
ALLEN, Charlotte, North Carolina, for Appellant. John Adam
Bussian, III, THE BUSSIAN LAW FIRM, PLLC, Raleigh,
North Carolina, for Appellees. **ON BRIEF:** John A. Zaloom,
David E. Fox, Research Triangle Park, North Carolina, for
Appellant. Mark J. Prak, Charles E. Coble, Eric M. David,
BROOKS, PIERCE, MCLENDON, HUMPHREY & LEON-
ARD, LLP, Raleigh, North Carolina, for Appellees.

---

**OPINION**

DUNCAN, Circuit Judge:

This appeal arises from the district court's grant of sum-
mary judgment to newspaper publishers bringing a First
Amendment challenge to a public airport's total ban on news-
paper racks inside its terminals. We found a similar ban
unconstitutional in *Multimedia Publishing Co. of South Caro-
lina, Inc. v. Greenville-Spartanburg Airport District*, 991 F.2d
154 (4th Cir. 1993), which guides our decision today. Because

the government interests asserted to justify the ban do not counterbalance its significant restriction on protected expression, we affirm.[1]

## I.

As this is an appeal from a grant of summary judgment, we present the facts affecting our First Amendment analysis in the light most favorable to the appellant. *See Pueschel v. Peters*, 577 F.3d 558, 563 (4th Cir. 2009). Appellant Raleigh-Durham Airport Authority (the "Authority") was chartered by the North Carolina General Assembly to operate the Raleigh-Durham International Airport (the "Airport"). *See* 1939 N.C. Pub. L. ch. 168. Appellees The News and Observer Publishing Company; The Durham Herald Company; The New York Times Company; and Gannett Company, Incorporated (the "Publishers") publish and distribute four daily newspapers: *The News & Observer*, *The Herald-Sun*, *The New York Times*, and *USA TODAY*.

## A.

The Airport facilitates air travel for the region known as the "Triangle area," which encompasses Raleigh, Durham, and Chapel Hill, North Carolina. Every year millions of travelers pass through the Airport. During the relevant time period, the Airport consisted of two terminals, labeled A and C, that shared one attached parking deck and eleven outer parking

---

[1]This appeal also involves a challenge to the district court's order awarding attorney's fees and costs under 42 U.S.C. § 1988 and 28 U.S.C. § 1920. The appellant contends that by awarding "those fees and expenses the publishers incur from December 2008 through the conclusion of this case," J.A. 1171, the court granted a "'blanket' award of attorney's fees . . . without any mechanism for evaluating the reasonableness of the prospective fees," Appellant's Br. at 62. Nothing in the court's order, however, suggests that the publishers would ever be entitled to attorney's fees and costs without proving their reasonableness. Therefore, we find no error and affirm.

lots reachable by shuttle bus. Each terminal had a non-secure area for ticketing and baggage pickup, and a secure area or "concourse" for loading and unloading passengers on planes. Whereas anyone could access the non-secure areas, only ticketed travelers and authorized personnel could enter the secure areas. Entering a secure area required passing through a security checkpoint operated by the Transportation Security Administration ("TSA").[2]

The Airport was intended not only to facilitate air travel but also to generate revenue. Federal law requires making the facility as financially self-sustaining as possible. *See* 49 U.S.C. § 47107(a)(13) (conditioning federal grant money upon "the airport owner or operator . . . maintain[ing] a schedule of charges for use of facilities and services at the airport . . . that will make the airport as self-sustaining as possible"). The Authority generated revenue for the Airport in various ways, including (1) leasing wall space for advertising, (2) charging a fixed rent to shops and restaurants inside each terminal, and (3) charging additional rent calculated as ten percent of gross profits.

Inside each terminal were numerous shops and restaurants, located mostly within the secure area where travelers waited before departing. These concessions, which included various eating establishments and retail stores, were selected and arranged under "a master plan for the retail and food service concession space" designed to "maximize customer service and . . . revenue to the Authority."[3] J.A. 265. The terminals

---

[2]The Airport was substantially renovated after this litigation began. Terminal C was demolished, a brand new terminal was constructed, and the Airport's terminals are now labeled 1 and 2. The Authority moved to supplement the record on appeal to reflect this renovation, but we denied its motion. *See Kirkpatrick v. Lenoir County Bd. of Educ.*, 216 F.3d 380, 384 (4th Cir. 2000) ("From a procedural standpoint, courts hearing a case on appeal are limited to reviewing the record that has been developed below.").

[3]In 1998, the Authority hired consultant Ann Ferraguto "to plan and implement a master plan for the retail and food service concession space

also contained vending machines, racks displaying brochures, information kiosks, television monitors, ATM machines, email stations, shoe-shine stations, trash bins, bathrooms, plants, and other features intended to serve travelers or boost revenue.

In early 2002, the Publishers contacted the Authority about placing coin-operated newsracks inside the terminals, where newsracks had never been placed before. At that time, newspapers could only be purchased from various shops. Terminal A's secure area had four shops selling newspapers. Three "RDU-Press" shops were located by Gates 5, 8, and 14/16, and an "RDU-Press Plus" shop was located by Gate 19. Terminal A's non-secure area had a "JQ Snacks" kiosk near the baggage claim area that offered *USA Today*. Terminal C's secure area had two shops selling newspapers. These were the "Hudson News" shop and the "Hudson News and Book" shop located near the TSA security checkpoint. Finally, Terminal C's non-secure area had one shop selling newspapers located between the baggage claim and ticketing areas. All these shops could offer any newspaper selection they chose, but the Authority generally expected them to carry *The News & Observer* and *The Herald-Sun*.

Although the Airport was open to the public twenty-four hours every day, the shops normally opened between 5:30 a.m. and 6:30 a.m., and closed between 8:00 p.m. and 9:00 p.m. They were "required to open before the first flights [left] . . . each morning and remain open until after the last flights

---

within the airport terminals." J.A. 265. The Authority implemented that plan in 2000 by reorganizing concession space inside each terminal and entering new concession contracts. No single document comprises the entire "master plan," but the Authority stated during oral argument that Ingrid Hairston's memorandum dated July 10, 2000, provides a reliable summary. Nothing in the record suggests that anyone involved in developing the master plan ever considered placing newsracks inside the terminals.

depart[ed] each evening." J.A. 296. Among the five hundred or so flights that arrived at or departed from the Airport every day, however, about thirty-seven were scheduled to arrive after the shops had closed. Passengers aboard these flights or any flights delayed beyond the normal hours were therefore unable to purchase a newspaper.

The record also reflects other issues regarding the adequacy of newspaper circulation. For example, the Authority received complaints that newspapers were sometimes unavailable during the early morning hours. Furthermore, The Durham Herald Company received complaints that the shops sold out of *The Herald-Sun*. Notwithstanding, the Authority declined to regulate how many newspapers were stocked, reasoning that the shops had a financial incentive to meet demand.

B.

In January 2002, The News and Observer Publishing Company (the "Observer") inquired about the possibility of placing newsracks inside the terminals. In response, the Authority asserted "an informal policy that newspapers would be distributed via the newsstands/gift shops in the terminals," and explained that "there had been no complaints from customers with respect to newspapers being available only in those shops." J.A. 230-31. The Authority also raised concerns about security, floor space, and losing revenue from shop sales.

The Observer and Authority did not discuss newsracks again until about two years later. On February 17, 2004, the Observer faxed a letter to the Authority asserting that its ban on newsracks would unlikely survive First Amendment scrutiny, requesting permission to place and stock "a limited number of newsracks at locations in the terminal and on the concourses . . . without charge," and promising that the newsracks would be "as 'security friendly' as technology currently allows." J.A. 167. The Authority refused this request. On March 31, 2004, the Observer faxed another letter asserting

"the right to place [Observer] newsracks on the concourses" and threatening litigation, but the Authority again refused. J.A. 168.

On September 2, 2004, the Publishers sued the Authority in the Eastern District of North Carolina. Their complaint alleged that the Authority's refusal to allow newsracks inside the terminals violated the First Amendment and North Carolina Constitution. The Publishers requested both injunctive relief and attorneys' fees and costs under 42 U.S.C. § 1988 and 28 U.S.C. § 1920. Specifically, the Publishers sought a permanent injunction letting them place 208 newsracks in 26 locations throughout the Airport terminals.[4]

The Authority and Publishers filed cross-motions for summary judgment under Federal Rule of Civil Procedure 56. After initially denying both motions, the district court amended its decision and granted the Publishers' motion for summary judgment regarding their First Amendment claim. *See The News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 588 F. Supp. 2d 653, 659 (E.D.N.C. 2008). The court reasoned that banning "the installation of news racks within the terminals 'substantially burdens the newspaper companies' expressive conduct within that public place,'" *id.* at 658 (quoting *Multimedia*, 991 F.2d at 159), and that concerns about security, aesthetics, preserving revenue, and preventing congestion were not "sufficiently powerful interests to justify the burden on protected expression," *id.* This appeal followed.

---

[4]Although it provides factual context, this request does not affect our First Amendment analysis. We decide today only whether the Authority violated the Constitution by banning any newsracks inside the terminals, not whether 208 newsracks should be mandated. That and other remedial issues remain for another day.

II.

On appeal, the Authority challenges the district court's grant of summary judgment. We "review[] a district court's decision to grant summary judgment de novo, applying the same legal standards as the district court." *Pueschel*, 577 F.3d at 563. Summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). Facts are "material" when they might affect the outcome of the case, and a "genuine issue" exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party is "entitled to judgment as a matter of law" when the nonmoving party fails to make an adequate showing on an essential element for which it has the burden of proof at trial. *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 804 (1999). "[I]n ruling on a motion for summary judgment, the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor." *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999) (internal quotations omitted). To overcome a motion for summary judgment, however, the nonmoving party "may not rely merely on allegations or denials in its own pleading" but must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e).

The Publishers' complaint alleged that the Authority's total ban on newsracks inside the terminals violated the First Amendment. *Multimedia* addressed a similar challenge on appeal from a final judgment after a bench trial. The district court there found that the Greenville-Spartanburg Airport Commission's (the "Commission") ban on newsracks inside the Greenville-Spartanburg International Airport ("GSP") violated the First Amendment.

GSP had two terminals, labeled A and B, that were connected by both a direct walkway and a ticketing area with

walkways leading to each terminal. Newspapers could be purchased either from a newsrack located in the parking deck or from a souvenir shop located between terminal A and the ticketing area. The shop was open from 6:30 a.m. to 9:00 p.m. and had a sign advertising the newsrack outside, but travelers using terminal B were unlikely to pass the shop. Likewise, travelers not using the parking deck were unlikely to pass the newsrack.

We held that "the First Amendment protects distribution as well as publication" of newspapers and that "modes of distribution involving permanent or semi-permanent occupation of publicly-owned property don't lose First Amendment protection because of that fact." *Multimedia*, 991 F.2d at 158. After noting that the Commission allowed only limited means of newspaper distribution, we upheld the district court's decision that concerns about aesthetics, preserving revenue, preventing congestion, and security failed to justify the heavy restriction on protected expression. *See id.* at 160-63.

Although the procedural posture here differs, *Multimedia* provides the substantive legal framework for our analysis. In deciding whether government property should be made available for protected expressive activity such as newspaper distribution, we apply different levels of protection for different types of government property. *See id.* at 162; *see also Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44-46 (1983). Stringent protection applies for "public forums," i.e., "places which by long tradition or by government fiat have been devoted to assembly and debate," but less protection applies for "nonpublic forums," i.e., "[p]ublic property which is not by tradition or designation a forum for public communication." *Perry*, 460 U.S. at 45-46. The Supreme Court has declared that airports are nonpublic forums. *See Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 679-80 (1992). Accordingly, the following protection applies in this case: "In addition to time, place, and manner regulations, the State may reserve the forum for its intended

purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Multimedia*, 991 F.2d at 159 (quoting *Perry*, 460 U.S. at 46).

Because no one argues that the Authority's total ban on newsracks inside the terminals discriminated based on viewpoint, we need only consider its reasonableness. *See id.* "[R]easonableness . . . must be assessed 'in the light of the purpose of the forum and all the surrounding circumstances.'" *Id.* (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 809 (1985)). Although the ban "need not be the most reasonable or the only reasonable limitation" on protected expression, "it isn't enough simply to establish that the regulation is rationally related to a legitimate governmental objective, as might be the case for a typical exercise of the government's police power." *Id.* Instead, *Multimedia* requires the following analysis:

> The degree and character of the impairment of protected expression involved, discounted by any mitigating alternatives that remain to the aggrieved party, must be considered. . . . The validity of any asserted justification for the impairment must then be assessed and, if found valid, then weighed in the balance against the impairment. . . . Because regulations other than mere time, place, and manner restrictions must be designed to reserve the forum for its intended purposes, the overall assessment must be undertaken with an eye to the intended purposes of this particular airport terminal and of the ways in which the regulated conduct . . . might actually interfere with the carrying out of those purposes.

*Id.* (internal quotations and citations omitted). Consistent with *Multimedia*, but through the lens of summary judgment, we

now consider whether the Authority's total ban on newsracks inside the terminals was reasonable.[5]

## A.

First we measure the Authority's restriction on the Publishers' protected expressive activity, namely, newspaper distribution. This analysis hinges not upon a projected difference in newspaper sales but rather upon the Publishers' access to Airport users for speech purposes. *See Lee*, 505 U.S. at 684 (upholding a regulation "limiting solicitation . . . to the sidewalk areas outside . . . [airport] terminals" and reasoning that, because "[t]his sidewalk area is frequented by an overwhelming percentage of airport users, . . . the resulting access of those who would solicit the general public is quite complete"). Among other things, we consider the extent to which people visiting the Airport could have received the Publishers' message by buying their newspapers. *See Multimedia*, 991 F.2d at 160 (reasoning that "the Commission's newsrack ban makes newspapers hard to come by for many patrons of the Greenville-Spartanburg Airport and impossible for others, thereby placing a heavy burden on the newspaper companies' protected distribution activity").

Even drawing all reasonable inferences in the Authority's favor, we are constrained to find that its total ban on newsracks inside the Airport's terminals significantly restricted the Publishers' ability to distribute newspapers. The record reflects that travelers had trouble buying newspapers from the shops. There were instances of unavailability during the early morning, and the shops would sell out of *The Herald-Sun*.

---

[5]The Authority contends that we should apply a different analysis, assessing reasonableness without weighing asserted justifications against the restriction on protected expression, because its ban on newsracks inside the terminals arose from a business judgment. *See* Appellant's Br. at 28-32. We disagree. Because the ban considered in *Multimedia* also resulted from a business judgment, this case cannot be distinguished from *Multimedia* on that basis.

Furthermore, the Authority concedes that newspapers were unavailable once the shops closed each day around 9:00 p.m. This means that passengers aboard the thirty-seven flights scheduled to arrive after that time or aboard flights delayed past that point could never purchase a newspaper upon landing. The Publishers' ability to reach these people inside the terminals was thus nonexistent. Finally, the Airport's tightly contained character enhanced this burden on newspaper distribution. *See id.* ("If a governmental entity imposed a similar ban on newsrack placement on city streets and sidewalks, those desiring a paper might find private vendors on nearby private property taking advantage of a newly created market; but the Airport's ban offers no similar opportunity for patrons or vendors."). For these reasons, we conclude that the Authority's total ban on newsracks inside the terminals significantly restricted the Publishers' protected expression.

B.

Next we determine whether the Authority asserted legitimate interests that counterbalance the restriction on protected expression. Given that the Authority may "reserve the forum for its intended purposes," our analysis here must keep in mind the Airport's intended purposes of facilitating air travel and raising revenue. *Perry*, 460 U.S. at 46. We also note that the Authority "need not have adduced specific factual evidence that its interests were advanced by the ban or that the expressive activity banned did interfere with the forum's intended use." *Multimedia*, 991 F.2d at 160. Instead, the Authority generally "was entitled to advance its interests by arguments based on appeals to common sense and logic." *Id.*

The Authority asserts four interests to justify totally banning newsracks inside the terminals: aesthetics, preserving revenue, preventing congestion, and security. We recognize the legitimacy of these interests. *See id.* at 161 (noting that government interests in aesthetics and preserving revenue are legitimate); *Lee*, 505 U.S. at 683-85 (deeming legitimate the

government interest in preventing congestion); *Jacobsen v. City of Rapid City*, 128 F.3d 660, 662-63 (8th Cir. 1997) (deeming legitimate the government interest in airport security). Below we consider whether they counterbalance the significant restriction on protected expression.

### 1.

First, we consider the Authority's interest in preserving the Airport's aesthetics. Although arguments based solely on logic or common sense normally are allowed, *Multimedia* stated that asserting an "interest in aesthetics . . ., without more, isn't sufficient to . . . permit the restriction of protected expression." *Multimedia*, 991 F.2d at 161. We added that aesthetic concerns have been found substantial enough to justify restricting protected expression only where "the aesthetic harm has been both substantial and widely recognized," and noted "that the speech restricted has often been of low First Amendment value." *Id.* (citations omitted).

The Authority has offered no evidence that placing newsracks inside the Airport's terminals would cause substantial and widely recognizable aesthetic harm. Nor does common sense or logic support that conclusion. We cannot see how an appropriate number of carefully placed newsracks fashioned to complement each terminal's interior design would have substantially undermined the Airport's aesthetics. Moreover, the Authority has proffered no justification to distinguish newsracks from the vending machines, racks displaying brochures, ATM machines, and other visual obtrusions that existed inside the terminals. For these reasons, we conclude that the Authority's aesthetic interest cannot counterbalance the significant restriction on protected expression.

### 2.

Second, we consider the Authority's interest in preserving revenue. The Authority argues that we should adopt its busi-

ness judgment under the "concession master plan," which excludes newsracks but purports to maximize revenue. J.A. 265. The Authority also proffered expert testimony that letting people buy newspapers from newsracks would affect shops' sales not only of newspapers but also of snacks and other items that customers seeking newspapers might purchase on impulse. Fewer sales would mean less revenue for the Authority, which received ten percent of shops' gross profits.

At the very least, these arguments fail to address the significant restriction on protected expression we identified, namely, that the Publishers cannot distribute newspapers inside the terminals to passengers arriving when the shops are closed, and that at times newspapers are otherwise unavailable. We cannot see, and indeed the Authority has offered no evidence or rational explanation for, how allowing newsracks in such circumstances could detract from sales or affect revenue.

Furthermore, we are not persuaded by the Authority's reliance on the master plan for concessions. Nothing in the record or briefs suggests that, when the master plan was being developed, its creators even considered newsracks. Accordingly, that the plan excludes newsracks provides no basis for concluding that placing some number inside the terminals would be inconsistent with maximizing revenue.

Finally, *Multimedia* considered and rejected a similar argument about lost revenue on the ground that the Commission "could have exacted a concession for papers sold from newsracks equal to that assessed against the shop." *Multimedia*, 991 F.2d at 161. We do not foreclose that possibility here.[6]

---

[6]Once again, we stress the limited nature of our inquiry. We consider only whether banning all newsracks inside the terminals violated the First Amendment. Such issues as number, placement, and cost are beyond the scope of our analysis.

For these reasons, we conclude that the Authority's interest in preserving revenue cannot counterbalance the significant restriction on protected expression.

3.

Third, we consider the Authority's interest in preventing congestion. The Authority draws support from the following description of newsracks:

> A standard newsrack projects twenty inches into a passenger movement corridor. An object of this size reduces the pedestrian traffic flow capacity of the corridor by 42 people per minute. A USA TODAY type newsrack, being used by a standing customer with the cabinet door fully extended, reduces pedestrian traffic flow capacity by 110 people per minute, without allowing for any baggage placed on the floor while the device is in use.

*Gannett Satellite Info. Network, Inc. v. Berger*, 716 F.Supp. 140, 153 (D.N.J. 1989), *rev'd on other grounds*, 894 F.2d 61 (3d Cir. 1990). The Authority might well posit a government interest against spreading a large number of newsracks indiscriminately throughout the terminals, but that is not the scenario presented. The Authority has not simply prohibited a large number of newsracks from being randomly spread around the terminals; it has banned them all. Accordingly, we need only consider how much congestion would result from a "limited number" of carefully placed newsracks—the amount requested by the Observer's February 17, 2004, letter. J.A. 167.

Having properly framed the question, we are ultimately bound by *Multimedia*. There, we stated that "common sense" allays fears of congestion around newsracks. *Multimedia*, 991 F.2d at 162. We reasoned that, because the Supreme Court found the congestion at an airport created by "a large number

of peaceful leafletters seeking out passersby and attempting to engage them in dialogue" insufficient to justify banning that expressive activity, *id.* at 162 (citing *Lee*, 505 U.S. at 690 (O'Connor, J., concurring)), "the obviously trivial congestion-related difficulties posed by carefully placed inanimate news-racks cannot justify the Commission's ban either," *id.* Accordingly, we find here that a limited number of carefully placed newsracks would create only trivial congestion.[7] *Cf. Ayres v. City of Chicago*, 125 F.3d 1010, 1013 (7th Cir. 1997) ("The incremental contribution to congestion that five ped-dlers can make in a sea of hundreds of thousands of festival-goers is very small.").

Furthermore, the record reflects the presence of numerous free-standing objects inside the terminals. The Authority prof-fers no basis on which to distinguish newsracks from the plants, vending machines, racks displaying brochures, ATM machines, email stations, trash bins, and similar objects already present. For these reasons, we conclude that the Authority's interest in preventing congestion cannot counter-balance the significant restriction on protected expression.

4.

Finally, we consider the Authority's interest in maintaining security within the Airport. The Authority contends that newsracks could become hiding places for bombs or weapons, and that stocking them would require letting delivery persons

---

[7]That *Multimedia* applied a different legal standard makes no differ-ence. Its holding about congestion was based on common sense rather than factual evidence, and summary judgment does not require ignoring logic or common sense to favor the nonmoving party. *See Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 743 (1st Cir. 1995) ("While the summary judgment mantra requires us to draw every reasonable inference in favor of the nonmoving party, inferences, to qualify, must flow ratio-nally from the underlying facts; that is, a suggested inference must ascend to what common sense and human experience indicates is an acceptable level of probability.").

through TSA security checkpoints. In support, the Deputy Airport Director for Operations Mike McElvaney provided an affidavit stating that placing newsracks throughout the Airport would create security risks and burden security personnel, who would need to screen delivery persons and repeatedly check newsracks for contraband. Notably, McElvaney confined his analysis to "the information provided by the Plaintiffs in this action identifying 26 locations where they want to place 208 news racks at the Airport." J.A. 316.

Without in any way diminishing the importance of security concerns, we again note the extent to which the Airport's evidence misses the mark. McElvaney premised his analysis on the existence of 208 newsracks throughout the Airport. The Authority, however, has banned all newsracks inside the terminals. McElvaney's analysis indicates little about the security risk created by allowing a carefully calibrated newsrack presence. Such risk could not be more than *de minimis*. We find *Multimedia* particularly instructive on this point: "The Federal Aviation Administration has no safety or security regulations addressed to newsracks, and proper design would render them highly unsuitable for bomb placement. . . . The incremental danger to airport security posed by newsracks is entirely *de minimis*." *Multimedia*, 991 F.2d at 162 (internal citation omitted).

In addition to being facially overbroad, the Authority's evidence has "fail[ed] to distinguish the security impact of newsracks from that of other places in the terminal where a weapon or bomb can be placed, such as, restrooms, trash cans, various plants placed in the terminal for aesthetic purposes, and within newsstands and kiosks." *News & Observer*, 588 F. Supp. 2d at 659; *see also Jacobsen*, 128 F.3d at 663 (dismissing a similar concern "because the terminal has many other places where a bomb could be hidden, such as waste containers and plant holders, and if anything, the glass door on the front of a newsrack makes it a less suitable place to hide a bomb."). We therefore conclude that the Authority's security

interest cannot counterbalance the significant restriction on protected expression.

In sum, the record contains insufficient evidence from which a reasonable jury could conclude that the Authority's asserted interests justify the total ban on newsracks inside the terminals. Nor does the record support the conclusion that carefully placing an appropriate number of newsracks inside the terminals would be incompatible with the Airport's intended purposes of facilitating air travel and raising revenue. *Cf. Multimedia*, 991 F.2d at 163 ("Nothing in the evidentiary record of this case, or in the Commission's arguments, suggests that a reasonably controlled placement of a limited number of newsracks in this terminal would significantly, if at all, interfere with either the primary or secondary intended purposes of its operation."). For the reasons stated above, we

*AFFIRM*.

DAVIS, Circuit Judge, dissenting:

The issue in this case is whether the court below properly granted summary judgment to the newspaper publishers when it held that the Raleigh-Durham Airport Authority's ban on newsracks violated the publishers' First Amendment rights under *Multimedia v. Greenville-Spartanburg Airport Dist.*, 991 F.2d 154, 156 (4th Cir. 1993). My colleagues find that "the government interests asserted to justify the ban do not counterbalance its significant restriction on protected expression[.]" Maj. Op. at 3. But that conclusion answers the wrong inquiry. Because this is an appeal from a grant of summary judgment, the question is simply whether the evidentiary record reflects the existence of genuine disputes of material fact. I conclude that it does, and therefore, I would vacate the district court's order granting summary judgment and remand this case for trial. Accordingly, I respectfully dissent.

## I.

In the Fifth Circuit, district courts have been afforded significant authority to find facts even when they are considering motions for summary judgment if the proceeding is a nonjury case. *Cf. In re Placid Oil Co.*, 932 F.2d 394, 398 (5th Cir. 1991). But while our court has grudgingly embraced that notion in a narrow context, *see Int'l Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Estrangers a Monaco*, 329 F.3d 359 (4th Cir. 2003), *cert. denied*, 540 U.S. 1106 (2004), this is not one of those instances. No party here consented to have the district court convert the summary judgment record into a trial record, permitting the district court to engage in fact-finding. Rather, in this case,

> the district court was not entitled to find facts and resolve conflicting inferences at this stage of the proceedings. Nor was it allowed to draw reasonable inferences from the facts before it as if it were a fact-finder. Indeed, given the posture of the case, the court was required to resolve all inferences in favor of the non-moving party.

*Id.* at 394 (Motz, J., dissenting). Accordingly, the facts in this case and the inferences fairly to be drawn from them must be viewed in the light most favorable to the non-moving party, here, the Authority. *Pueschel*, 577 F.3d at 563. Even though this case will be tried without a jury because the parties did not request one, there must nevertheless be a trial.

## II.

Appellant Raleigh-Durham Airport Authority (the "Authority") operates the Raleigh-Durham Airport (the "Airport"), a facility that has two passenger terminals, each with its own departure and arrival concourse, baggage claim, and ticketing area. As of 2007, approximately ten million passengers passed

through the Airport annually, and in 2004, the Authority's operating budget was approximately 65 million dollars.

The vast majority of the Airport's passengers have ample access to newspapers. There are multiple vendors in the airport, many of which sell newspapers and magazines, along with other non-newspaper items, such as food. As the majority opinion indicates, these shops were "required to open before the first flight [left] . . . each morning and remain open until the last flight depart[ed] each evening." J.A. 296. They normally opened between 4:30 a.m. and 6:30 a.m. and closed between 8:00 p.m. and 9:00 p.m., although the shops often closed later when flights were delayed.

As the majority indicates, in January 2002, The News and Observer Publishing Company ("the Observer") inquired about the possibility of placing newsracks inside the terminals. The Authority tentatively agreed to allow installation of newsracks in the Airport's parking areas. The Observer declined the Authority's offer, likely because it did not want to pay rent and concession fees. The Publishers then filed suit, demanding that the Authority permit them to install 208 newsracks throughout the Airport.

### III.

The surprising procedural history of this case merits attention. On September 29, 2007, the district court denied cross motions for summary judgment. The court explained that it was required by *Multimedia* to undertake an intensive fact-based inquiry, and that it could not resolve this case as a matter of law because it contained multiple material and disputed facts.

The court identified five such facts. They were (1) the severity of the burden faced by customers at the Airport in buying newspapers; (2) the validity of the aesthetic justification offered by the Authority for refusing to allow racks in the

terminals; (3) the Authority's potential loss of revenue from the allowance of racks in the terminals and the resulting decline in sales the Authority's authorized concessions would see as a result; (4) the safety issues involved in having news-racks in crowded terminals; and (5) the security issues involved in having newsracks in the secure areas of the termi-nals. J.A. 1123-27.

The district court concluded:

> Both parties have answered, in various forms, their opponents arguments with straight factual contradic-tions—contradictions that require a weighing of the evidence, not mere arguments on the law. Such a multitude of disputed and highly specific factual contradictions, enhanced by the volume of the motions and reply, raises a cacophony of arguments that cannot be settled in a mere summary judgment hearing.

J.A. 1127.

The court scheduled a bench trial for November 13, 2007. On the eve of trial, Plaintiffs' counsel requested a continuance to address a serious medical problem in his family, and the court granted the continuance. Neither party filed anything with the court between November 13, 2007, and November 24, 2008.

Over one year after the court denied the cross motions for summary judgment, on November 24, 2008, the district court issued an amended order, *granting* summary judgment to the Plaintiffs. The court offered no explanation for the change, and none is apparent, since the court did not receive any fil-ings or additional briefing between its first and second rul-ings.

In its amended order, the district court applied the same reasonableness analysis from *Multimedia* that it used in its

first opinion. The only difference was that — without receiving any new factual evidence or hearing any new legal arguments — it methodically reversed each of its prior conclusions, converting genuine and material factual disputes into legal conclusions simply by declaring them as such. J.A. 1140-42.

IV.

Clearly, the legal framework set forth in *Multimedia* controls the outcome of this case. The question presented under *Multimedia* is whether the ban is reasonable "in the light of the purpose[s] of the forum and all the surrounding circumstances." 991 F.2d at 159. The Authority must establish a reasonable fit between its ends and its means. *Bd. of Trustees of State University of N.Y. v. Fox*, 492 U.S. 469, 480 (1989). The fit need not be perfect, only reasonable. The *Multimedia* test evaluates the severity of the burden imposed by the ban, and then weighs that burden against the government's interests and asks if the ban is reasonable. *See* Maj. Op. at 12-13.

A.

As did the majority, I start by quantifying the burden suffered by potential newspaper customers. In *Multimedia*, the court's burden analysis focused on whether newspaper distributors and potential newspaper buyers had access to newspapers via alternative channels such as gift shops or retail stores. *Multimedia*, 991 F.2d at 159. This analysis hinges not upon a projected difference in newspaper sales but rather upon the Publishers' access to Airport users for speech purposes. *See Lee*, 505 U.S. at 684.

To help identify the overall burden suffered by the customers at the Airport, it is useful to contrast the situation at the Airport with the situation at Greenville-Spartanburg Airport ("GSP"), the airport at issue in *Multimedia*. This comparison makes it clear that a factfinder could reasonably find that the

Airport's customers suffer only a minimal burden. The Airport boasts significantly more newspaper vendors, the vendors are open longer hours, and the newspapers sold by these vendors are more prominently displayed.

Customers at the Airport enjoy substantially broader and easier access to newspapers than those at GSP. Prior to *Multimedia*, GSP contained only one shop, and it was "a substantial distance from the gate areas." *Multimedia*, 991 F.2d at 159. Moreover, the sole shop was accessible only in one of the GSP's two terminals. At the Airport, however, customers may choose between multiple gift shops in both of its terminals, both inside and outside the secure passenger area.[1]

The shops at the Airport are also open longer. At GSP, the single shop was open from 6:30 a.m. to 9:00 p.m. *Multimedia*, 991 F.2d at 160. Here, the newspaper vendors are open before the first flight leaves the Airport each morning and they remain open until after the last flight departs each evening, typically from as early as 4:30 a.m. to as late as 9:00 p.m. J.A. 296. Further, many shops remain open after the last flight is scheduled to depart if extraordinary events, such as bad weather, cause flight delays. J.A. 296, 327, 352.

The newspapers at the Airport are also more prominently displayed than they were at GSP. The shops draw attention to their newspapers with displays visible from outside the shops. J.A. 327, 326-27. At GSP, the only shop that sold newspapers did not display them visibly, and instead, the newspapers were put in the back of the shop on a flat shelf. *Multimedia*, 991 F.2d at 160.

---

[1]At the time the district court denied summary judgment, Terminal A had five shops and two kiosks selling newspapers, with one of those shops and one of those kiosks located outside the secure passenger area. J.A. 413-15. Terminal C had three shops selling newspapers, one located outside the secure passenger area and two in the secure area. J.A. 289-290.

For all of these reasons, it is clear that the burden on passengers at the Airport is considerably less onerous than the pre-*Multimedia* burden imposed on GSP passengers. But the analysis does not end with a simple comparison, because a review of the absolute burden imposed on the Airport's passengers by the newspaper rack ban also demonstrates the weakness of the burden.

The overall burden is weak because the vast majority of passengers flow through the Airport when shops selling newspapers are open, and it is undisputed that these passengers have access to newspapers. More specifically, approximately 500 passenger flights arrive and depart from the Airport daily. J.A. 418. Of these 500 flights, all departing passengers and 90% of arriving passengers have full access to open shops. *Id.* The small percentage of passengers who lack access to the shops are those who arrive in the late evening, after 9:00 p.m. As the Authority demonstrates, these late arrivals are extremely unlikely to buy anything because they are deplaning passengers, and deplaning passengers account for only 10% of all airport purchases. *Id.* (explaining that enplaning (i.e., departing) passengers make 90% of all airport purchases). Further, as a matter of common sense and logic, *see Multimedia*, 991 F.2d at 160, passengers who arrive at an airport in the late evening are unlikely to buy newspapers. By 9:00 p.m., the day is over; the newspaper that was published earlier that morning contains outdated news, soon to be replaced by the next day's newspaper. For all of these reasons, very few people are practically affected by this ban.[2]

Although the majority purports to draw all reasonable infer-

---

[2]The majority notes that the Airport's "tightly contained character enhanced" the burden imposed by the newspaper rack. But the Authority offered to permit the Observer to install newspaper racks in its garages. J.A. 230. If the Observer had installed such newspaper racks, deplaning passengers who arrived late in the evening — assuming that they wanted newspapers — would have had access to purchase them.

ences in favor of the Authority as the non-movant, its burden analysis suggests otherwise. The majority finds that passengers suffer a heavy burden when they attempt to purchase newspapers because (1) travelers had "trouble buying newspapers from the shops[,]" (2) "[t]here were instances of unavailability during the early morning," and (3) "the shops would sell out of *The Herald-Sun*." Maj. Op. at 11. These assertions are removed from their factual context and fail to accord the Authority the proper favorable inferences to which it is entitled under our precedents.

As to the first issue, the overwhelming evidence is that travelers did not have trouble buying newspapers at the shops.[3] Travelers could patronize any one of multiple stores open for their convenience, all of which sold newspapers and displayed them prominently. At the time the district court *denied* summary judgment (before it *granted* summary judgment on the same evidentiary record), Terminal A had five shops and two kiosks selling newspapers, with one of those shops and one of those kiosks located outside the secure passenger area. Terminal C had three shops selling newspapers, one located outside the secure passenger area and two in the secure area. Further,

---

[3]The majority may be referring to the occasional complaint received by the Authority. The evidence shows that the Authority received very few complaints about newspapers, J.A. 296, 424, and that most complaints referred to the lack of newspapers early in the morning. J.A. 313. Between November 2004 and August 17, 2007, less than 0.7% of the total feedback (or 9 of 1283 complaints) to the airport expressed any concern about access to newspapers. J.A. 417; *see also* J.A. 1068 (statistics from April of 2003); J.A. 313 (airport has received less than 5 complaints about newspapers since moving its complaint system online); J.A. 424 (airport received one request in 2007 to keep newsstands open later on non-secure side of airport). The Airport concedes that it received some complaints directly after September 11, 2001, but that those complaints probably resulted from the then-new rules that forbid non-ticketed passengers access to the terminals. J.A. 295. The sum of these complaints is minor, especially considering that the airport was undergoing construction and rule changes regarding airport security throughout part of this period, two issues that gave rise to temporary problems that were quickly resolved.

if newspaper purchasers did not want to wait in line, they could use the "honor boxes" posted in some stores. J.A. 327.

The majority also claims that the facts demonstrate that newspapers are sometimes unavailable in the morning, but it omits mentioning the *reason* that newspapers are unavailable in the morning. The reason that newspapers are sometimes not available in the morning is *not* because of the newspaper rack ban. Instead, *it is because the Publishers deliver the newspapers late*. J.A. 352-53. The Airport's stores open before the first flight departs, and the shops' employees attempt to pick up the newspapers before they open or immediately upon opening.[4] J.A. 328, 352-53, 430-31. But, the papers are often delivered late to the Airport by the Publishers. The shops cannot sell the papers until the Publishers deliver them.

The majority's last assertion, that on rare occasions, some shops sold out of *The Herald Sun*, also overlooks or ignores some key evidence in the record. The record shows that the shops rarely run out of papers, and that when they do, the shop employees simply ask the Publishers to deliver more. J.A. 330. This presents the Publishers with the same choice that they would face with an empty newspaper rack, and in either case, the Publishers would be free to decide whether to deliver additional papers, or not. For all of these reasons, it is clear that a factfinder could reasonably find that the newspaper rack ban imposes only a modest burden.

---

[4]The Paradies stores (CNBC New, Press, and two Press Plus locations), J.A. 326, attempt to pick up newspapers no later than 5:20 a.m., but often, the papers are not available until 6:00 a.m. J.A. 327-28, 430-31. The three Hudson stores open between 4:30 a.m. and 5:00 a.m., and check the loading dock for newspapers every fifteen minutes. J.A. 352-53. These stores report that the *USA Today* and *The News & Observer* are typically delivered around 5:30 or 6:00 a.m., and that the *New York Times* and *Durham Herald Sun* often do not arrive until 6:00 a.m. or later. *Id.* Thus, due to no fault of their own, the stores sometimes open without newspapers.

## B.

As does the majority, I turn next to determine whether the Authority asserted legitimate interests that, when considered together, present a genuine dispute of material fact as to whether the ban is reasonable in light of the burden that it imposes. *See* Maj. Op. at 11. As a threshold matter, I noted that the facts of this case differ from those of *Multimedia* in one very critical way.[5] In *Multimedia*, the district court concluded that the governmental interests asserted as justification for the ban were *post hoc, pretextual creations. Multimedia*, 991 F.2d at 162. We affirmed. Thus, in *Multimedia*, the court found the "government interest" side of the balancing test to entirely lack credibility. *Id.* Manifestly, the same is not true here. In fact, the Airport's four justifications create genuine issues of historical as well as ultimate fact regarding the reasonableness of the ban "in the light of the purpose of the forum and all the surrounding circumstances." *Multimedia*, 991 F.2d at 159. Thus, this case should be resolved at trial and not decided as a matter of law. The Authority offers four justifications for its ban on newspaper racks: revenue and economics, security, passenger flow, and aesthetics.[6] I review each in turn.

---

[5]There are also important procedural differences here as the *Multimedia* decision followed a trial, not a grant of summary judgment.

[6]Here, the Authority presented substantial economic arguments that were based on a master concession plan created in collaboration with neutral paid consultants. This plan was comprehensive and thoughtful, and it also increased the Authority's revenue.

The majority argues that the Authority's master concession plan is not probative evidence because it did not explicitly consider newspaper racks. But this assertion seems illogical — obviously there are at least two ways to sell newspapers, via stores and via newsracks. When the Authority created its master plan, it hired two outside consulting firms and performed customer surveys. It was surely aware of the possibility of using newspaper racks, but decided against it, and ultimately selected a plan that sold newspapers through retail shops in order to maximize its revenues. J.A. 285. And the plan worked — it boosted retail sales 68% and increased rental revenue from those sales by 17%. J.A. 298.

1.

Under federal law, the Authority must be financially self-sustaining and the revenues generated at the Airport should be expended only for its capital and operating costs. 49 U.S.C. § 47107(a)(13) & (b)(1). Thus, the strongest justification for the ban of newsracks is that it increases the Authority's revenue. Selling newspapers in stores increases revenue in three ways: it increases store rents, it increases retails sales, and it increases advertising revenues. Increased sales drive up the store rents because stores pay additional rent based on their retails sales, generally 10% of gross receipts. J.A. 1027-28.

Drawing all reasonable inferences in favor of the Authority, selling newspapers in stores dramatically increases retail sales and therefore, Authority income. J.A. 283-88, *see* J.A. 266-68, 271-2 (explaining the "node approach" to retail shopping where retail and food stores are clustered together to encourage impulse buying). Store-selling generates two streams of revenue. First, the stores generate significant income from selling the physical newspaper. J.A. 266, 285. An Airport Retail Store Executive with several stores at the Airport explained that the *New York Times* and *USA Today* are both in the top 20 of items sold in his stores, and that *USA Today* is among its highest gross profit items. J.A. 267. Experts estimated that in 2004, the loss of newspaper sales alone would total $25,200. J.A. 273.

The second revenue stream, income produced by the impulse buys of newspaper purchasers, is even more substantial.[7] Newspaper sales spark the sale of items like bottled water or chewing gum, and these small purchases generate

---

[7]The majority suggests that the Airport could re-coup the lost revenue by "exact[ing] a concession for papers sold from newsracks equal to that assessed against the shop." Maj. Op. at 14 (citing *Multimedia*, 991 F.2d at 161). But this argument only applies to lost revenue from the sales of the actual newspapers, not lost sales from impulse buying.

not-so-small profits. One Airport retail executive explained that newspapers help his profits because

> newspapers (like bottled water) are in my view the equivalent of bread and milk at grocery stores. . . we have observed the people come into our shops to buy newspapers, but once they are there, they buy other items. If newspaper racks were put inside the airport, it would impact sales.

J.A. 226. Other sales managers at the Airport agree. J.A. 327, 352. Thus, taking the majority's suggestion at face value, even if the Authority could charge the Publishers a premium to allow installation of newsracks, "a reduction in total revenue would still exist because of the lost sales on related goods and services also available at the newsstands." *See Gannett*, 716 F. Supp. at 152; *Jacobsen*, 128 F.3d at 664 (noting that installing newsracks would cause concessionaires to "lose revenues, making its exclusive contract less valuable, . . . [which] in turn will reduce the City's leverage in bargaining for terms such as minimum annual concession fees and pro rata utility charges."). Each of these income streams increases the funds that accrue to the Authority.

Installing newspaper racks would also likely decrease advertising revenue at the Airport. The Authority sells advertising space on the Airport's walls and in floor display cases; the vast majority of such space, about 95%, comprise wall displays. J.A. 272. These ads produce an average of $1,750,000 in sales annually, which translates into approximately $875,000 in annual revenue to the Authority. J.A. 292. Since *all* newspaper racks must be placed on the floor,[8]

---

[8]The record is clear that newspaper racks *cannot* be installed in walls. The Authority provided ample evidence to show that it has little or no interstitial wall space that could support recessed newsracks. J.A. 320, 324, 1017-18. Any existing space is already occupied with ATM machines, telephones, or fire extinguishers. J.A. 320. Thus, the only way to incorporate the boxes would be to install them on the floor either adjoining or adjacent to the walls. J.A. 1018.

installing newspaper racks would eliminate floor space available for advertising displays and cover some wall ads. J.A. 250, 272, 292. Thus, newspaper racks will likely decrease the Authority's ability to generate advertising revenue, and decrease it substantially.[9] If, for example, twenty-five percent of wall space was displaced by newspaper racks, the Authority would lose between $182,000 and $214,000 in annual revenues. J.A. 274.

The Authority's losses from rents, retail sales, and advertising revenue sum to hundreds of thousands of dollars. It has a substantial interest in keeping this money, and perhaps an interest that might make reasonable the modest inconvenience that the newspaper ban imposes on a few late-night passengers. Again, the issue here is merely whether a factfinder could find that this ban is reasonable after considering the severity of the burden imposed by the ban, here, a very modest burden, in light of all of the Authority's interests, including but not limited to the Authority's interest in generating revenue.

Tellingly, the majority finds that the "Authority's interest in preserving revenue cannot counterbalance the significant restriction on protected expression." Maj. Op. at 15. But as an appellate court, we are not in the position of a factfinder. Moreover, all of the Authority's interests must be considered jointly, not individually. And finally, this statement is striking because the issue is not whether the Authority should win at trial — it is merely whether the Authority successfully demonstrated a genuine issue of material fact and therefore deserves an opportunity to go to trial.

---

[9]Adding newsracks would also *not* increase the Publishers' sales. Evidence from other North Carolina airports shows that when airports have newsracks and retail stores, the vast majority of buyers flock to the stores. For example, sales of USA Today from newsracks at Charlotte, Greensboro, and Wilmington airports total .91%, 3.49%, and 3.14% of total sales at these airports—very small numbers indeed. J.A. 379. At best, newsracks re-direct a few sales.

It is worth noting that economics and revenue arguments can be sufficiently strong on their own to make the newspaper rack ban reasonable. *See Gannett*, 745 F.2d at 775 ("When a government agency is engaged in a commercial enterprise, the raising of revenue is a significant interest."). But the Authority provided additional justifications, e.g., security, passenger flow, and aesthetics, to which I will now turn.

2.

The Authority asserts the reduction of security risks as a government interest.[10] As a matter of common sense and logic, security is of paramount importance at airports in our post-9/11 world. First and foremost, officials worry that the newsracks could be used to hide explosive devices or weapons. J.A. 244-45. Airport security would need to check these potential hiding places several times each day. J.A. 317. Although the TSA does not have any regulation that bans newsracks, a TSA Director opined that "based on my 20+ years of physical security experience, I would discourage this in the strongest possible terms. This is an invitation for trouble." J.A. 247-48. In light of this advice, since 9/11, the Authority has removed all vending machines except ATM machines from the secure side of the terminal. J.A. 232, 291.[11]

The majority, instead of considering the record, relies on a

---

[10]The majority dismisses these concerns because it does not distinguish the impact of newsracks from plants, vending machines, racks displaying brochures, ATM machines, email stations, trash bins, and similar objects already present. Maj. Op. at 16. As the factual record makes clear, however, after the increased security following 9/11, the Airport removed all such items (except ATM machines) from the secure part of the terminal. There is no evidence that the Publishers merely want to put newspaper racks on the unsecure side of the terminals, so the court must consider the security concerns for the secure side of the terminal.

[11]The non-secure side of the terminal has a few vending machines such as a luggage cart machine, public telephones, a phone card dispenser, a flower machine, and a flight insurance kiosk. J.A. 232, 291.

citation from *Multimedia* that the risk posed by newsracks is "de minimis." *Multimedia*, 991 F.2d at 162. But this quote loses it persuasiveness once it is placed in its proper context: *it predates September 11, 2001*. The imperative of airport security has changed dramatically, and governmental efforts in these regards certainly have grown more vigorous. For example, only ticketed passengers and badged support personnel who have undergone background security checks are permitted to pass into the secure areas of passenger terminals now. J.A. 911-912, 971-72. Similarly, TSA now requires that all newspapers go through security checkpoints. In contrast, *Multimedia* was decided in 1993, significantly before these security changes were deemed necessary.

The majority also improperly discounts the testimony of the Deputy Airport Director for Operations Mike McElvaney. McElvaney provided an affidavit stating that placing newsracks throughout the terminal would create security risks and burden security personnel, who would need to screen delivery persons and repeatedly check the racks for contraband. J.A. 316. The majority completely undercuts his testimony simply on the basis that he responded to the Publishers' demand to install 208 newspaper racks. The majority does not cite any evidence that actually discredits McElvaney, nor does the majority indicate any reason to believe that installing fewer than 208 newsracks would completely eliminate potential security problems. Instead, without any support from the evidentiary record, the majority assumes that "a carefully calibrated newsrack presence" would not create more than a "de minimis" risk. Maj. Op. at 17. I would not discount McElvaney's testimony, and would instead permit a factfinder to apply it to the government's case for establishing reasonableness. In sum, security risks are a legitimate factor to be considered in the reasonableness analysis.

### 3.

The arguments for passenger flow and aesthetics are the Authority's secondary arguments, but the majority gives short shrift even to those. I disagree particularly with the majority's disregard for the Authority's passenger flow argument.[12] The majority acknowledges the Authority's argument that each newsrack "reduces pedestrian traffic flow capacity by 110 people per minute, without allowing for any baggage placed on the floor while the device is in use." Maj. Op. at 15 (citing *Gannett Satellite Info. Network, Inc. v. Berger*, 716 F. Supp. 140, 153 (D.N.J. 1989), *rev'd on other grounds*, 894 F.2d 61 (3d Cir. 1990)). But instead of crediting this demonstrated pedestrian hindrance, the majority, without justification, wholly discounts it.

More specifically, the majority opinion sets up a straw-man when it considers only "how much congestion would result from a 'limited number' of carefully placed newsracks," Maj. Op. at 15, and then leaps to the conclusion that the congestion caused by these newsracks would be "trivial" and "cannot justify the Commission's ban." *Id.* But this conclusion misses the mark for three reasons. First, the majority should not work from the assumption of a "limited number" of newsracks. Granting all favorable inferences to the Authority, it is clear that the Publishers want *208* newsracks distributed throughout the Airport, not a limited number. This court is asked to review a summary judgment order, not to give instructions on how to run an airport.

Second, regardless of the number of newsracks, the majority should not ignore the very real hindrance that these racks

---

[12]A factfinder understandably might be less concerned about aesthetics. The Authority relies principally on concerns about visual clutter. J.A. 250. Although this concern is valid to the extent that increased clutter translates into decreased advertising revenues, *id.*, the pure aesthetics argument does little to help the Authority's cause.

impose on passenger flow. If each newsrack impedes pedestrian traffic flow by 110 people per minute, 208 newsracks impedes *200,000 people per minute*, and a quarter of that number of newsracks impedes almost 6,000 people per minute. This slow-down could cause real trouble, particularly during peak hours or during the holiday season. At the very least, it is a valid government objective deserving of consideration at trial.

Lastly, the majority again forgets to consider all of the Authority's interests in tandem and holistically, instead determining that "the Authority's interest in preventing congestion cannot counterbalance the significant restriction on protected expression." Maj. Op. at 16. The majority should balance *all* of the government's proposed interests against the burden imposed by the ban, not weigh each argument individually and atomistically. Thus, whether or not the passenger flow argument is dispositive as a stand-alone argument is entirely inconsequential. It is simply one evidentiary peg giving rise to a discrete argument, which is to be weighed with others against the burden imposed by the ban to determine if the ban is reasonable.

## C.

The ultimate issue before the trial court is whether the Authority's ban is found reasonable when the Authority's interests are weighed against the burden imposed by the ban. *Multimedia*, 991 F.2d at 159. Here, the evidence shows that the government has significant interests in generating revenue and in airport security, along with a modest interest in ensuring smooth passenger movement. Further, the evidence amply supports a finding that the burden imposed on the Publishers and on readers by this ban on newspaper racks is, if not de minimis, negligible. It affects a very small number of airport passengers, all of whom are statistically unlikely to purchase newspaper. Despite these factors, the majority finds the

Authority's ban on newspaper racks unreasonable as a matter of law.

With respect, although the majority describes this conclusion as *a legal conclusion*, the evidence in the summary judgment record exposes it as the *factual conclusion* that it truly is. There simply is no doubt that reasonable minds might reasonably disagree over how best to strike the balance in this case. Accordingly, I conclude that the district court's work is not finished and that this court cannot and should not do that work for the district court. I would therefore vacate the order of the district court and remand this case for a trial on the merits of Plaintiffs' claims and the Authority's affirmative defenses.

## V.

For all of the above reasons, I respectfully dissent.